WILLIAM J. HISS, ANNIE AMES HISS, his wife, and WILLIAM J. HISS, Trustee *vs.* EMMA L. WEIK, by her husband and next friend, OTTO B. WEIK.

*Will—Undue influence—Evidence.*

A will was executed when the testator was over seventy-three years of age, and physically feeble, while his mental faculties were relatively clear. The value of the testator's personal estate exceeded fifty-five thousand dollars, and he owned besides considerable real property. By his will he gave to an invalid daughter a small annuity. To his insane son and that son's motherless daughter, a child of nine or ten years of age, he gave nothing, stating in his will as a reason why he made no provision for his son, that he had already given to him all that he desired to bestow upon him. To his married daughter, who had importuned him for money, and had declared that she had great influence with her father, and that "he would do anything she

Hiss *vs.* Weik.

would ask him to do," he left the bulk of his estate. Shortly before the will was made, she denounced her insane brother to the testator, as lazy and indolent, and unworthy of sympathy. The testator was devotedly attached to his grand-daughter, and was deeply moved by the affliction of his son; and it was in evidence that after the will, disinheriting his son, was executed, and shortly before the testatator's death, the husband of the daughter, to whom the property was left, in company with a colored servant whom he took with him as a witness, carried into the country, and there delivered to the testator's insane son, five thousand dollars in bonds, as a gift from his dying father. Three days before the will was executed, the testator conveyed to his married daughter, in consideration of five dollars and natural affection, real estate valued at forty thousand dollars. In an action involving the validity of the will, neither the daughter nor her husband testified. HELD:

That there was legally sufficient evidence from which the jury could properly find, if they believed it to be true, that the will had been procured by undue influence.

APPEAL from the Court of Common Pleas.

The case is stated in the opinion of the Court.

*Exception.*—The testimony having been closed on both sides, the plaintiff offered the two following prayers:

1. That if the jury find that Edward R. Ames was influenced by his daughter, Annie Ames Hiss, in making the disposition of his estate, shown by the will offered in evidence, and if they find that the extent of her influence over him in that respect was so great as to deprive him of the power to dispose of his estate according to his own judgment and free will in reference to the amount and situation of his estate and the relative claims of different persons who were or should have been the objects of his bounty, then said influence, if found by the jury, was undue influence, and they should find for the plaintiff on the first and second issues.

2. That if the jury find from the evidence that Edward R. Ames was influenced by his daughter, Annie Ames

Hiss, or any other person or persons in making the disposition of his estate shown by the will offered in evidence, and if they find that the extent of her or their influence over him in that respect was so great as to deprive him of the power to dispose of his estate, according to his own judgment and free will, in reference to amount and situation of his estate and the relative claims of different persons who were and should have. been the objects of his bounty, and that such influence was used for the purpose of raising prejudices in his mind against those who would have been the objects of his bounty, and by representing that the father of the plaintiff, who was the son of the said Edward R. Ames, was dead, which was false, then such influence and such representations (if the jury so find,) was undue influence and fraudulent representations, and the plaintiff is entitled to recover on the third issue.

The defendants specially excepted to the plaintiff's first prayer,

1st. Because there was no sufficient evidence that Edward R. Ames was influenced by Mrs. Annie A. Hiss in making the disposition of his estate shown by the will offered in evidence.

2nd. Because there was no sufficient evidence that the extent of the influence of Annie A. Hiss, over the said testator in respect of said will, was so great as to deprive him of the power to dispose of his estate according to his own judgment and free will.

The defendants specially excepted to the plaintiff's second prayer,

1st. Because there was no sufficient evidence that Edward R. Ames was influenced by Mrs. Annie A. Hiss, or by any other person, in making the disposition of his estate shown by the will offered in evidence.

2nd. Because there was no sufficient evidence that the extent of the influence of said Annie A. Hiss, or of any

other person, over the said testator, in respect of said will, was so great as to deprive him of the power to dispose of his estate according to his own judgment and free will.

3rd. Because there was no evidence that the said Annie A. Hiss ever represented that the father of the plaintiff was dead, nor any evidence that any other person represented to the said Edward R. Ames that his said son was dead.

4th. Because there was no evidence that the said Edward R. Ames, at the time he made the said will, or at any other time, believed his said son was dead.

The defendants offered the following six prayers:

1. The factum of the paper purporting to be the last will and testament of Edward R. Ames, offered in evidence, being conceded, and it being conceded that there is no issue raising the question of the mental capacity of the said Edward R. Ames, and there being no sufficient evidence that the said last will and testament was procured by undue influence or fraud, the verdict of the jury must be for the defendants on all the issues.

2. There is no sufficient evidence in this case that the last will and testament of Edward R. Ames, offered in evidence, was procured by undue influence, therefore the verdict of the jury must be for the defendants on the second issue.

3. There is no sufficient evidence in this case that the last will and testament of Edward R. Ames, offered in evidence, was procured by fraud, and therefore the verdict of the jury must be for the defendants on the third issue.

4. That the influence which will avoid the will of a testator must have been exerted on the testator to such a degree as to have amounted to force and coercion, destroying his free agency, or by importunities that could not be resisted, so that the motive was equal to

force or fear; it must not have been the influence of affection or attachment, or the mere desire to gratify the wishes of another, for that would be a very strong ground in favor of a testamentary act; and the burden of proof is upon the plaintiff in this case to show not only that such influence existed, but that it was exerted for the purpose of procuring the execution of the will offered in evidence in this case, and that the same was obtained by means of the undue influence so exerted.

5. As the execution of the will offered in evidence is conceded, and as there is no issue raising the question of the mental capacity of the testator, the jury in determining the issues in this case are bound to assume that Edward R. Ames, the testator, had sufficient mental capacity to make the said will at the time he executed it; and if the jury shall find, as testified to by Judge Morris, that the said will was read to said testator and approved by him before he signed it, the jury are also bound, in passing on said issues, to assume that the contents of said will were understood by said Edward R. Ames when he signed it.

6. The law concedes to a person of sound mind the right to dispose of his or her property in any manner he or she may deem proper, consistent with its policy; and it is no valid objection to a will that it prefers one child over another, provided the testator was mentally competent, and at the time free from undue influence or fraud.

The Court (PHELPS, J.,) overruled the defendants' exceptions to the plaintiff's first prayer, and granted the said prayer, and sustained the defendants' exceptions to the plaintiffs' second prayer, and rejected the said prayer; and granted the defendants' third, fourth, fifth and sixth prayers, but rejected their first and second prayers. The defendants excepted, and the verdict being for the plaintiff on the first and second issues, the defendants appealed.

The cause was argued before ROBINSON, C. J., BRYAN, FOWLER, McSHERRY, BOYD, and BRISCOE, J.

*Thomas M. Lanahan,* and *Bernard Carter,* (with whom was *Frank Gosnell,* on the brief,) for the appellants.

*James E. Carr, Jr.,* and *W. Pinkney Whyte,* for the appellee.

McSHERRY, J., delivered the opinion of the Court.

There is but one bill of exception in the record now before us, and the chief question which it raises is whether there was legally sufficient evidence offered by the caveator, the appellee here, to justify the trial Court in submitting the case to the jury.

On May the sixth, 1879, the last will and testament of the late Bishop Ames, who died on April the twenty-fifth of that year, was admitted to probate by the Orphans' Court of Baltimore City, and some twelve years thereafter his granddaughter, the appellee, upon attaining her majority, filed a caveat assailing is validity. Issues were framed and were finally tried before a jury in the Court of Common Pleas of Baltimore City. The trial resulted in a verdict for the caveator upon the first and second issues, and for the caveatees upon the third issue. These issues were, first, as to whether the paper-writing purporting to be the will of Bishop Ames was his last will and testament; second, as to whether the same paper-writing had been procured by undue influence exercised and practiced upon the testator; and third, as to whether it had been procured by fraud. At the close of the evidence in the Court below the appellee presented two, and the appellants presented six, prayers for instructions to the jury. The appellee's first prayer was granted, and her second was rejected. The appellants' first and second prayers were rejected, and

Hiss *vs.* Weik.

the remaining four were granted. The appellee's instruction accurately defined undue influence as understood in its legal sense, and left to the jury to find from the evidence the existence of the facts necessary to constitute such an influence. The appellants' first and second prayers asked the Court to withdraw the case from the jury upon the ground that there was no sufficient evidence that the will had been procured by undue influence. If the appellee's instruction was properly granted, there was no error committed in rejecting the appellants' first and second prayers; but if there was error in rejecting these latter, there was of necessity error in granting that of the appellee. So, as already suggested, the controlling inquiry is, was there legally sufficient evidence, that is, competent evidence, tending to prove the issues, which ought to have gone to the jury? Or, stating the question conversely, was the evidence offered by the caveator, assuming it all to be true, as must be done when weighing its legal sufficiency upon a prayer of this character, so utterly inconclusive or devoid of probative force as not to enable an ordinary intelligent mind to draw a rational conclusion therefrom in support of the proposition sought to be maintained by it? The solution of this inquiry involves an examination of the evidence contained in the record. Before, however, proceeding to do this, it may not be amiss to observe that it is not our province under the law to determine whether the verdict of the jury was either right or wrong, or to decide whether the will ought or ought not to have been set aside. And, even though we might be of opinion from the whole of the evidence before us, that the jury had reached an incorrect or mistaken conclusion of fact, we are without authority to disturb their verdict, if the Court below committed no error in its rulings upon the legal propositions submitted to it. The principles which must

control this Court, and the view from which we must
approach a discussion of the case, are essentially and
radically different from those which would be applicable
and appropriate were we authorized to consider the pro-
priety of the verdict upon a review of a motion for a new
trial.    Whether the jury ought to have found a verdict
the way they did, or a different way, is a matter which
the law gives us no jurisdiction to decide.    As an appel-
late Court we cannot review the findings of the jury
upon matters of fact, nor can we pass upon the compara-
tive weight of the conflicting evidence submitted to
them.    If no error of *law* has been committed by the
inferior Court in any of its rulings, the verdict of the
jury, whether right or wrong, just or unjust, and even
though it be directly against and in the very teeth and
face of the preponderance of the evidence, cannot be
interfered with here; and there is no power lodged else-
where to set aside the verdict, except with the Judge
before whom the case was tried below.    We have conse-
quently to determine, not whether the jury ought, in
view of the facts, to have stricken down the will, but
whether there was any legally sufficient evidence in the
case from which they could properly find, if they be-
lieved it to be true, that the will had been procured by
undue influence.    *Jones, et al. vs. Jones,* 45 *Md.,* 144;
*Spencer vs. Trafford,* 42 *Md.,* 1.

Undue influence is that degree of importunity which
deprives a testator of his free agency, which is such as
he is too weak or too feeble to resist, and will render the
instrument executed under its influence not his free and
unconstrained act.    *Davis vs. Calvert,* 5 *G. & J.,* 269.    It
is closely allied to, and in many of its aspects strongly
resembles, actual fraud, and like the latter, when most
cunningly executed is exceedingly difficult to unmask.
The results accomplished in a given case, the divergence
of those results from the course which would ordinarily

and naturally be looked for, the situation of the party taking benefits under a will towards the person who has executed it, and the irantecedent relations to and dealings with each other, the legitimate, but unrecognized claims of others upon the bounty of the testator and their dependence upon him, the instincts of justice of which every unbiased mind is sensible, the natural ties of parental affection, together with all the circumstances surrounding the transaction under investigation, and the inferences legitimately deducible from them, often furnish, in the absence of direct evidence (which from the very nature and secrecy of the wrong itself, is rarely obtainable,) ample ground for the conclusion that undue influence has been used to accomplish an end which may be gross in its injustice, and whose very existence cannot be satisfactorily accounted for, except upon the hypothesis that undue influence has produced it. *Grove vs. Spiker*, 72 *Md.*, 300.

Turning now to the facts of the case, it appears that Bishop Ames was upwards of seventy-three years of age when he died. He executed the will before us on April the seventh, 1879, and died on the twenty-fifth of the same month. He had become physically feeble, and, whilst his mental faculties remained relatively clear, his *will* had lost its former strength and power as he himself appreciated when he stated to the Rev. Dr. Price, upon being urged by the latter to correct by his episcopal authority something that needed to be righted in the church: "It is too late, my time has passed; 'the grasshopper has become a burden.' " He had been of robust frame and of vigorous intellect, and his long and faithful service in the cause of religion marked him as an eminently just and upright man. He had three children. One, a son who had been an officer in the army, but who, when the will was made, was, and for some time prior thereto had been, insane; another, an invalid

daughter who survived her father but a short while; and the third, a married daughter, and she and her husband are the caveatees in the case and are the appellants in this Court. Bishop Ames also left a widow—his second wife—surviving him, but she died some years ago. The value of his personal estate was upwards of fifty-five thousand dollars, and he owned besides this considerable real estate, both in and near Baltimore, and in and near Chicago. By his will he gave to his widow an annuity of two thousand dollars payable quarterly; to his invalid daughter, an annuity of six hundred dollars; to his insane son, and that son's dependent daughter, nothing; but to his married daughter his entire estate. When the will was made the son was a widower with one child, a daughter of nine or ten years of age, and she (her father having died some years ago) is the caveator assailing the will.

Whilst the gross inequality of this will—the palpable injustice of its provisions—which absolutely cut off an insane son upon whom a motherless and helpless child was dependent, and gave to an invalid daughter a mere annual pittance out of a large and valuable estate, would not alone be sufficient to annul the will, yet, such a disposition by an aged and feeble testator furnishes intrinsic evidence involving the will in suspicion, and was competent to be considered by the jury in connection with other circumstances, in passing upon the issue of undue influence. *Davis vs. Calvert*, 5 *G. & J.*, 301.

It is a reasonable assumption that an unbiased mind will not voluntarily do an apparently unjust act without a sufficient or satisfactory motive, because, as observed by one of the most philosophical writers on the law of evidence, "there must pre-exist a motive for every voluntary action of a rational being. * * * * Man is not the passive subject of necessity or chance; nor are his moral judgments merely the abstractions of logic;

Hiss *vs.* Weik.

on the contrary, he is endowed with instincts, passions, and affections, and above all, with reason and the capacity of estimating the qualities and tendencies of his volitions and actions, and with the power of choosing from among the various inducements, emotional and rational, which are presented to him, the governing principles of his conduct." *Wills on Circum. Evidence*, 40. Now, the motive may be good or bad, but bad motives do not ordinarily influence just men, and when a false statement of fact is assigned as a reason for the doing of an act, which act requires a satisfactory motive to account for its having been done at all, it is a fair and legitimate inference that the act itself cannot be attributed to the motive assigned; because, if a reason apparently sufficient to justify a particular act be given as a motive for the doing of that act when the act standing alone without the explanation suggested would be either wrong or unjust on its face, and if the reason so assigned be palpably untrue in fact, as contradistinguished from mere misapprehension; then, the act obviously proceeded, not from the motive assigned, but from either a bad motive, or no motive at all, and consequently, in the latter instance, the act done would not be the voluntary act of an unbiased or uninfluenced mind; for the reason, that an unbiased and uninfluenced mind is incapable of intelligently acting without a motive. Now, *some* motive must have influenced a wealthy father to disinherit his insane son and his insane son's helpless child, if he did this voluntarily; but the whole life of this eminent ecclesiastic is a solemn protest against the hypothesis that he was influenced by a *bad* motive, and his calling and his character alike forbid the assumption that he knowingly resorted in his last will to subterfuge or falsehood to conceal his actual motive if he had one. Hence, if the reason given in his will for disinheriting his son is in fact not true, the only alternative left is, that no

motive originating in his own mind influenced him at all, and the act which was ostensibly his and was ostensibly justified by him by the assignment of a false explanation would not be his voluntary act. The reason given in the will for cutting off his son is thus stated : "I make no provision for my son Edward R. Ames, Jr., for the reason that I have already given to him all that I desire to bestow upon him." But was that reason true in fact? That the jury might legitimately infer that it was not, is shown by a singular circumstance which has neither been discredited nor contradicted. On the Sunday preceding the Bishop's death, and therefore thirteen days after the date of the will wherein he had declared that he *had* already given to his son all he desired to bestow upon him, William J. Hiss, one of the caveatees, in company with a colored man-servant whom he took with him as a witness, carried into the country and there delivered to the Bishop's insane son, across a picket fence on the margin of the public highway, five thousand dollars in bonds as a gift from the dying Bishop. Whether these bonds were valuable or worthless does not appear, nor does Mr. Hiss go upon the witness stand to offer the slightest explanation of this transaction. If the Bishop sent the bonds he obviously had not, when he made his will, given to his son all he intended to bestow upon him. This delivery of bonds after the date of the will flatly contradicted the declaration of the will, and afforded a reasonable ground for questioning the truth of the motive assigned for cutting off the son, and it was, therefore, competent to the jury to infer that the son was not disinherited for that reason, and if not for that reason, no other being suggested, that he was disinherited by his father without reason at all; and if so disinherited that the will which did that was not the act of an unbiased or uninfluenced mind. Especially is this a legitimate inference when

the jury had before them evidence, which, as we have
said, must, in considering the appellant's prayers be
assumed to be true, and which moreover was not contra-
dicted, to the effect that the Bishop was devotedly
attached to his little grand-daughter and was deeply
moved by the affliction of his only son, and that Mrs.
Hiss, the caveatee, who secured all the estate, cruelly
denounced her insane brother to their aged father,
shortly before the will was made, as lazy and indolent
and unworthy of sympathy.

But there was other competent evidence adduced, the
weight of which was a matter exclusively for the jury.
Mrs. Hiss, it was proved, had declared that she had
great influence with her father, that "he would do any-
thing she would ask him to do." She had been heard
importuning him for money, and upon one occasion he
replied, "My God, Annie, if you don't let me alone
you will set me crazy." And just three days before the
will was executed the feeble and decrepid old man con-
veyed to this same importunate daughter in considera-
tion of five dollars and natural love and affection, real
estate in Baltimore City valued at forty thousand dol-
lars. Why he made that conveyance has not been
explained, but in and about the same period of time he
had been heard by his domestics to declare that he was
going to make his will and leave his property to his
children, and this was said to or in the presence of Mrs.
Hiss. But when the will was opened after his death
this previously declared intention was not realized; on
the contrary, one of the persons who should have been
an object of his bounty was wholly cut off; another was
but scantily provided for, and another, his son's child,
whose tender years and helpless condition so patheti-
cally appealed to his sense of justice that in his feverish
restlessness upon his death-bed he exclaimed, "she
could not be left alone in the world, that there would

have to be something done for her," was never men-
tioned; and his entire estate under the deed and under
the will was bestowed upon the daughter who had im-
portuned him for money, and had asserted her ability to
induce him to do as she wished; and who, just after he
had breathed his last, in the room where he died, "took
some gold out of the drawer before her father was cool
on the bed." It was perfectly natural and legitimate
for the jury to draw the inference that a will so repug-
nant to the dictates of parental affection, so at variance
with the instincts of a just man, and so divergent from
the course which according to his antecedent declarations
might have been expected, was procured by undue influ-
ence and was not the voluntary emanation of an un-
biased mind; because "there is a uniformity in human
action and a consequent possibility of foreseeing it,
sufficient to be the basis of confidence and the determi-
nation of action between man and man. * * * * *  The
homeliest and commonest transactions with men every
day imply the confidence that they will act in the imme-
diate future as they have been acting in the past." *Harris'
Philosophical Basis of Theism*, 399.

It is a generally accepted rule of law that the sup-
pression or non-production of pertinent and cogent evi-
dence necessarily raises a strong presumption against
the party who withholds such evidence when he has it
in his power to produce it. *Wills, Cir. Ev.*, 187. Now,
neither Mr. nor Mrs. Hiss, who were the caveatees, in
reference to whose conduct, as hereinbefore observed,
evidence had been given to the jury, went upon the wit-
ness stand to deny what had been imputed to them, or
to give any testimony whatever refuting or tending to
refute the serious charge of undue influence. Their
very failure to contradict the accusations made against
them might well have been regarded by the jury as an
admission of their inability to dispute them truthfully;

Hiss *vs.* Weik.

and their neglect to testify might equally have been presumed to have proceeded from a consciousness of guilt. In any event, it was a circumstance which the jury had a perfect right to weigh and to consider.

We have sketched but an imperfect outline of some of the features of the evidence, with a view of showing that the Court below would not have been warranted in withdrawing the case from the consideration of the jury. We are not unmindful of the fact that much evidence was offered upon the side of the caveatees having a tendency to show that Bishop Ames was uncontrolled or uninfluenced when he made his will. But, in disposing of the prayers we have been discussing, we have no right to look to or to consider any of this contravening proof. It was for the jury to contrast and weigh it; and if they reached a result not supported by the evidence, it was for the trial Court to remedy the error by granting a new trial.

In cases involving the question of the legal sufficiency of the evidence, this Court has, as a general rule, confined itself to a statement of the *conclusion* reached by it, without reciting the evidence, as in *Stirling vs. Stirling,* 64 *Md.,* 138, and *Moore vs. McDonald, et al.,* 68 *Md.,* 341; but we have ventured to depart to some extent in the case at bar from that practice, in order that the grounds of our decision might not be misunderstood.

From what we have said it follows that the rulings of the Court below must be affirmed, and it is so ordered.

*Rulings affirmed, and*
*cause remanded.*

(Decided 12th January, 1894.)