# LIZZIE A. KENNEDY ET AL. *vs.* GEORGE A. DICKEY ET AL.

### *Wills—Insufficient Evidence of Undue Influence.*

Upon the trial of a caveat to a will the jury found as facts that the testatrix at the time she executed the will was of sound and disposing mind and was aware of its contents and effect. The trial Court instructed the jury that there was no legally sufficient evidence of undue influence. The testatrix was eighty-four years of age and the will gave nearly all of her estate, amounting to about half a million dollars, to her two sons, and only small legacies to her two grandchildren, the issue of two deceased daughters, but these two grandchildren had received about two hundred thousand dollars each under the will of the husband of the testatrix. The evidence in the case examined and *held*, to be legally insufficient to show that the will was made as the result of importunities, which deprived the testatrix of her free agency, and that consequently the instruction of the trial Court was correct.

The mere fact that one of the chief beneficiaries under a will advised the testatrix, his mother, to execute it, is not *per se* evidence of undue influence, since honest persuasion, unaccompanied by fraud or deceit, does not show that the person persuaded was deprived of free agency.

Appeal from Baltimore City Court (BAER, J.)

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and SCHUMCKER, JJ.

*Edgar H. Gans* and *George Whitelock*, for the appellants.

*Bernard Carter* and *Randolph Barton*, for the appellees.

FOWLER, J., delivered the opinion of the Court.

The question presented by this appeal is whether there is any legally sufficient evidence to be found in the record to show that the late Agnes Dickey was induced to execute her will by undue influence.

We have nothing to add to what has been said in regard to the recognized necessity of protecting the statutory right of

testamentary disposition, provided this right be exercised according to well recognized rules. It is idle, however, to concede the right, and then by a strained and unnatural application of well settled rules prevent its exercise.

In the case now before us there were six issues sent from the Orphans' Court of Baltimore City to the Baltimore City Court. The *first* issue was, whether the testatrix, at the time of the execution of her will was of sound and disposing mind and capable of executing a valid deed or contract; the *second* was, whether at the time she executed the will, she was aware of its contents and effect; the *third* was whether the will was executed according to the forms required by law; the *fourth*, being the only one directly involved in this appeal, was whether she was induced to execute her will by undue influence; the *fifth*, was she induced to execute her will by fraud, and the sixth and last, whether the will in question was the last will and testament of Mrs. Dickey.

These issues were tried by a jury in the Baltimore City Court. At the close of the testimony of both sides the plaintiffs (caveators) offered two prayers, the first of which was granted and the second refused. The defendants (caveatees) offered nine prayers (the seventh having been withdrawn) all of which were granted. No exception has been taken by the plaintiff to the rulings of the Court upon these prayers—except to the refusal of their second and the granting of the defendant's second. The plaintiff's second prayer asked to have submitted to the jury the question of undue influence, but by the defendants second prayer they were instructed that no legally sufficient evidence of such influence had been offered—and they were similarly instructed on the question of fraud. On all the other issues the jury found for the defendants: that is to say, they found first that the testatrix at the time she executed her will was of sound and disposing mind; second, that when she executed her will she was aware of its contents and effect; third, that the will was executed in due form (this was conceded by the plaintiffs); fourth, under the instructions by the Court that there was no undue influence exercised; fifth,

also under instruction by the Court, that there was no fraud, and sixth that the will before us is the last will and testament of Mrs. Dickey. It also follows from the finding of the jury on the first issue, namely, that she was of sound and disposing mind and memory as required by law, that at the time of executing her will she understood the nature of the business she was then engaged in, recollected the property she meant to dispose of and the persons to whom she meant to give it, and understood the manner in which she disposed of it, and the *relative claims of the different persons who were or might be the objects of her bounty.* They were so instructed by the defendants fourth prayer. But the only rulings of the Court excepted to by the plaintiffs are the refusal of their second and the granting of the second of the defendants, the result of which rulings is that so far as the question of undue influence is concerned, the case was taken from the jury, and they were told by the Court that there was no legally sufficient evidence of such influence. The findings of the jury therefore upon all the issues, and the rulings of the Court on the question of undue influence being against the plaintiffs they have appealed.

The first question involved in the main inquiry is what constitutes undue influence? and, second, what evidence is to be resorted to in order to establish such influence; third, is the evidence contained in this record legally sufficient to show that the will in controversy is the result of undue influence as understood and defined by the law?

1. From the time of *Davis* v. *Calvert*, 5 G. & J. 302, to the present day, this Court has been consistent in defining what constitutes undue influence. In the leading case just cited the doctrine is thus stated: "Honest and moderate intercession or persuasion, unaccompanied with *fraud* or *deceit*, and where the testator has not been threatened or put to fear by the flatterer or persuader" will not be sufficient. Again, quoting from the same case "A testator should enjoy full liberty and freedom in the making of his will, and possess the power to withstand all contradiction and control. That degree, therefore, of importunity or undue influence which deprives a testator of his

free agency, which is such as he is too weak to resist, and will render the instrument not his free and unconstrained act, is sufficient to invalidate it." As a result of this general doctrine it has also been held that while the allegation of undue influence concedes such testamentary capacity as is required by law, yet the character and degree of the influence exerted involve necessarily to some extent, the physical and mental condition of ths testator at the time of the execution of the will. "The influence that would be unlawful if exerted upon one advanced in years and in declining health, of a weak and vacillating will might be altogether unavailing with one in robust health and of a firm and robust purpose. Any evidence, therefore, which tends to prove the precise mental condition of the testator, and to place him before the jury as he was when the will was made, is admissible." *Griffith* v. *Diffenderffer*, 50 Md. 480. While therefore, testamentary capacity is to be assumed in discussing undue influence *Stirling* v. *Stirling*, 64 Md. 151, yet "what degree of such influence will vitiate a will depends much upon the bodily health and mental vigor of the testator, for that which would overwhelm a mind weakened by sickness, dissipation or age, might prove *no* influence at all to one of strong mind in the vigor of life." *Woerner on Administrators*, sec 31. Again in the case of *Hiss* v. *Weik*, 78 Md. 446, the present Chief Judge says that undue influence "is closely allied to and in many of its aspects strongly resembles actual fraud, and like the latter when most cunningly executed, is exceedingly difficult to unmask." In the case just cited and in that of the more recent case of *Somers* v. *McCready*, 96 Md. 438, the doctrine of undue influence and the rules which should govern its application are so fully and so clearly announced that we would unnecessarily extend this opinion by a reference to our many decisions to the same effect.

The principles thus declared have been the settled law of this State for many years, and we are not called upon, therefore, to fortify them either by argument or the citation of authorities.

Indeed this controversy does not involve any real difference of opinion as to what constitutes undue influence. Nor as to the second question we are to consider, that is, what evidence is to be resorted to in order to establish undue influence; for counsel on both sides substantially agree as to the sources from which such evidence must be obtained. These sources are first the testimony contained in the entire record, for there is no exception or objection to any part of it; and second the character of the will. In *Hiss* v. *Weik, supra*, it is said : "The results accomplished in a given case, the divergence of those results from the course which would ordinarily and naturally be looked for, the situation of the party taking benefits under the will towards the person who has executed it, and their antecedent relations to and dealings with each other, the legitimate but unrecognized claims of others upon the bounty of the testator and their dependence upon him, the instincts of justice of which every unbiased mind is sensible, the natural ties of parental affection, together with all the circumstances surrounding the transaction under investigation, and the inferences legitimately deducible from them, often furnish, in the absence of direct evidence (which from the very nature and secrecy of the wrong itself, is rarely obtainable), ample ground for the conclusion that undue influence has been used to accomplish an end which may be gross in its injustice, and whose very existence cannot be satifactorily accounted for except upon the hypothesis that undue influence has produced it."

We come then to the real question and that is whether there is to be found in the record in this case any legally sufficient evidence to show that the late Mrs. Dickey was induced to execute her will by undue influence exercised by her two sons. We say her two sons, for they alone are charged with this wrong. If they are innocent it is not contended that any wrong in this respect was done by any other person.

While it has been frequently said "that on a question depending, as this does, entirely upon the testimony, no good result can possibly arise from a recapitulation of the evidence"

and "that it is enough for the Court to announce the conclusion it arrives at," *Somers* v. *McCready, supra,* and cases there cited, yet this rule has been more honored in the breach than in the observance, and we will, therefore, in this instance honor it in the same manner, and refer as briefly as may be to the evidence so that we may determine whether there was error in taking the case from the jury on the question of undue influence.

Mrs. Agnes Dickey, the testatrix, was eighty-four years of age at the time she executed her will on the 11th May, 1900. She died in March, 1903, eighty-seven years old. Her husband, the late William J. Dickey, executed his will 19th May, 1896, and died August of the same year. The testatrix and her husband had four children, two daughters, Sarah and Lizzie A., and two sons, George A. and William A. Lizzie married Charles W. Dorsey in December, 1872, and she died in 1873, a few days after the birth of her first child, who is now Lizzie Kennedy. She is one of the plaintiffs. Sarah married Chas. W. Dorsey in 1877 and of this marriage there was one child, Edgar A. Dorsey, and he is the other and remaining plaintiff and grandchild of the testatrix. So that at the time she made her will and at the time of her death the two sons and the two grandchildren of the testatrix just mentioned were alive. To her grandson she bequeathed two thousand dollars and to her granddaughter, Lizzie A. Kennedy, five thousand dollars. All the rest and residue of her estate, with the exception of about $20,000 which was bequeathed to several legatees, she gave to her two sons absolutely. The result was that they received each about $210,000, and her two grandchildren received as follows: Mrs. Kennedy and her children $9,000, and Edgar A. Dorsey, $2,000. According to the calculation made by the counsel for plaintiffs, if the testatrix had made an equal division of her estate among her sons and her grandchildren, the latter taking the place of their deceased parents, Mrs. Kennedy and Edgar A. Dorsey would have each received, not counting the $20,000 outside legacies, $111,250. Thus is shown what the plaintiffs contend is an

enormous disparity in the legacies—so great as to demand some explanation; and it is said that such a result is so shocking to a proper sense of justice that "it can only be satisfactorily accounted for upon the hypothesis that in making her will she was not a free agent, but was dominated and controlled by her sons."

Conceding, as is clearly shown by the testimony, that the testatrix was much attached to both of her grandchildren, but particularly so to Mrs. Kennedy, it would, indeed, seem cruel and unjust not to have given them a larger share of her estate of nearly half a million dollars—if they had been at all dependent upon her bounty. But they were not, and she, of course, was fully aware of that fact.

The late William J. Dickey was a successful manufacturer, merchant and banker. He left a fortune of a million dollars which by his will was bequeated to trustees to hold for seven years from the date of his death, the income to be paid to his wife and children in equal proportions fully authorizing his trustees, during the seven years, to continue the business in which he was engaged and to manage his estate. At the end of that period the trustees were directed to divide his estate among his wife, children and grandchild, Mrs. Dorsey, Edgar A. Dorsey's mother being alive at that time. It appears from the testimony that the trustees named in Mr. Dickey's will, namely his two sons, George A. and William A. and his wife (the testatrix whose will is now before us), continued the business as directed for seven years after the death of Mr. Dickey, and the two grandchildren, Mrs. Kennedy and Edgar A. Dorsey, his mother having died in the meantime, each received as their portions of their grandfather's estate about $162,000, together with an annual income of $10,000 each during the seven years; so that the plaintiffs had, and the evidence shows, still have each a fortune of over $200,000.

In the year 1866 the late Mr. Dickey took into business with him his son, George A. Dickey, and some six or eight years later his other son, William A. Dickey, also became a member of his father's firm. The father, his two sons and his

son-in-law, Charles A. Dorsey, constituted the firm of Wm. J. Dickey & Sons—which so continued to the death of the senior member thereof in 1896. The evidence shows that during a portion of this time George A. Dickey was ill and took no active part in the business, but it also clearly appears that for the most part after 1881 when Mr. Dorsey became cashier of the Manufacturers' Bank, the two sons had charge of the firm's business. While we do not think it necessary to go into the details it is sufficient to say that both sons had been, with the exception above noted, engaged in the business established by their father ever since they were respectively seventeen years old. During the latter part of the elder Mr. Dickey's life he devoted much of his time to the management of the Manufacturers' National Bank. As we have seen Mr. Dorsey was also engaged there, and hence for some years before the father died, his two sons had entire charge of the active management of the business of the firm. We have referred thus briefly to some of the testimony to show the relations between the parties as well as the fact that the plaintiffs were in nowise dependent upon their grandmother for the comforts, to say nothing of the luxuries, of life.

There was also a good deal of testimony on the part of the plaintiffs tending to prove that during the latter part of testatrix's life her memory began to fail and that she was unable to recognize certain persons with whom she had been more or less acquainted, but none of this testimony, assuming it all to be true, shows her to be a weak and vacillating old woman. On the contrary the proof is quite the other way. George A. Dickey says his mother had a very strong will. Other witnesses testified that she was very positive and even stubborn; that she had a will of her own and could not be easily moved. Mrs. Campbell a niece of the testatrix said she was very decided and that her mind could not be easily changed by any one, and Mrs. Kennedy one of the plaintiffs characterized her grandmother as a woman of very strong will and very strong constitution. But however weak her memory may have been as to other persons and things and at other times, the evi-

dence is positive, clear and uncontradicted that at the time of the execution of her will she was able to and did recollect "the property she meant to dispose of, the persons to whom she meant to give it and understood the manner in which she disposed of it and the relative claims of the different persons who were or should have been the objects of her bounty." The evidence was not only to this effect, but the jury so found, under instructions unobjected to by the plaintiffs. Hence in determining the question whether there was any legally sufficient evidence of undue influence offered we must assume that the testatrix had that character and degree of capacity above indicated and found by the jury.

It certainly seems to us that the direct testimony relied on by the plaintiffs is most meagre and unsatisfactory. They base their contention that undue influence was used, *first*, on the testimony of George A. and William J. Dickey and second, on the testimony of Mrs. and Miss Mullin. It will be remembered that the testatrix's son, George, being a bachelor lived with her. He testifies that about a year before she executed her will she spoke to him about making it; that he had said nothing to her on the subject; that she spoke of her age and said she could not expect to live many years longer and that she ought to make a will; that she renewed the subject several times; that he never introduced it; that he told her whenever she was ready to make her will he would see Mr. Randolph Barton who had performed the same service for his father; that he did request Mr. Barton to see his mother; that her instructions were taken by Mr. Barton and the will drawn by him. We will presently refer particularly to Mr. Barton's testimony. The other son, William J. Dickey, testified that he told his mother she ought to make a will, that as he and his brother George had helped their father to make his fortune they ought to be remembered and were entitled to some consideration, and that Mrs. Kennedy and Edgar Dorsey had been amply provided for by their grandfather. The conversations of both sons with their mother took place several years before she executed her will. We do not consider it neces-

sary further to reproduce the testimony of these two witnesses. We have examined and considered it and fail to find in it anything to justify the contention of the plaintiffs. They had a right to suggest to their mother that she ought to make a will and remember them. She knew as well as either of them what her husband had bequeathed to Mrs. Kennedy and Edgar Dorsey, and if we are to give any weight to uncontradicted evidence in the record, she was of opinion that Mrs. Kennedy already had too much money. But it was contended that the statement made by Wm. J. Dickey to his mother to the effect that he and his brother had helped their father to make his money was a misrepresentation and in fact a false statement made to the testatrix for the purpose of unduly influencing her mind. It may be said, however, that if the statement thus made was intended to be the statement of a fact, she was as well acquainted with the history of the firm as her sons were. She knew her sons had been working with their father since they were boys, and that while they made money for themselves they helped him to make his fortune. She knew also that for a number of years before his death they were entrusted with the active management of the manufacturing branch of the business while he and Mr. Dorsey were conducting the banking business in Baltimore. The statement was, therefore, true, and it can hardly be said that it was improper for the son under these circumstances to express the opinion that he and his brother were entitled to some consideration.

When, however, we examine the testimony of Mr. Randolph Barton, Sr., who took the instructions and directions of the testatrix for the preparation of her will, it seems to us all doubt disappears. We cannot here reproduce that testimony in full. He says that after some general conversation Mrs. Dickey told him she wanted to make her will; that he got a pencil and paper and said to her. "Now Mrs. Dickey what is your desire. * * * She then gave me her instructions. I wrote them down in lead pencil and repeated them to her, read them again to her, ascertained that they were correct just

as she desired and after some more general conversation I left." Although both of her sons were present, Mr. Barton says that not a word came from them as to the contents of the will. To use his own language he said: "She gave them (the instructions) to me. I am as clear as I can be about anything that a man has to recollect, that Mrs. Dickey's instructions were absolutely her own; they were positive and clear, and my recollection is that not a word was said by anyone else." Again he says in reference to her instructions. "They were entirely unaided, no suggestions from anyone, but they were purely her voluntary and clear cut instructions."

. The only other direct testimony relied on is that of the two witnesses who had a conversation with William A. Dickey on the street in Baltimore in December, 1899, to the effect as one of them testified that he said his mother could be persuaded to make no will and the result would be that the Dorseys and Kennedys would come in equally with him and his brother. The other witness testified that what Mr. Dickey said on the occasion referred to was that his mother would not make a will. Assuming this testimony to be true, as we must, we are unable to understand how it tends to prove that when, contrary to the statement or expression of opinion, the will was made some six months after the time the conversation was had William A. Dickey did or could have unduly persuaded or dominated his mother's will. He did not say that *he* could thus persuade her. The most natural and reasonable inference to be drawn from what it is alleged he said is that he was apprehensive that *some one else* might induce her to pursue a course which would be injurious to him and his brother or that she had decided to do so.

. Our conclusion is that there is nothing in any of this direct testimony either standing alone or taken in connection with any or all of the circumstances of the case which furnishes what the law has declared to be legally sufficient testimony. *Hiss* v. *Weik, supra; Somers* v. *McCready, supra.* In the case last cited it is said that "in the inquiry as to the legal sufficiency of evidence to support an allegation of undue influence, it is

not sufficient to find that such evidence shows there was influence which affected the testator's disposition of his property; but in order to render such evidence legally sufficient it must show that the influence claimed to be undue dominated his will, *at the time he was making such disposition of his property*, took away his free agency and prevented the exercise of judgment and choice by him.    There may have been advice, suggestion or importunity going to affect his purpose and his act in the disposition he chooses to make; yet if he had testamentary capacity and was free and unconstrained in his volition, *at the time of making his will*,.the influence that may have inspired it or any of its provisions, will not be that influence which the law denounces as undue.    The inquiry to be made in any given case goes to the effect of the influence in bringing about the testamentary act, and how the effect was produced; and includes, first, the existence of the influence; second, the opportunity for it to be exerted; and, third, its actual exercise or operation to the extent and in such a way as to make the act in question the product of the influence uncontrolled by and irrespective of any volition on the part of the testator.''    There is, therefore, no legally sufficient evidence to show either incapacity on the part of the testatrix or undue influence exercised over her by her sons prior to or at the time she gave instructions for the preparation of her will.    Nor is there anything to indicate there was a change in this situation thereafter.

Unless, therefore, the will itself affords evidence legally sufficient to show that it was the result of undue influence the ruling of the learned Judge of the Baltimore City Court was correct.

This question, we think, may be briefly disposed of.

Of course it is conceded that Mrs. Dickey had the right, being capable and free from undue influence to give any portion or all of her estate either to her sons or to her grandchildren.    But it is said the fact that she gave only small pecuniary legacies to the latter and the residue to the former s under the circumstances of this case such evidence of undue

influence as should have gone to the jury. But it seems to us when it is remembered that plaintiffs were already in the enjoyment of what the testatrix must have and did consider ample fortunes and that the sons who represented the family in the business community and would continue the business in which her husband made his fortune and his reputation as a leading man, it is not at all remarkable that she made the disposition of her property which is here complained of by the plaintiffs.

If it be conceded that her husband followed the rule of equality in the division of his property among his children and grandchildren she certainly was under no obligation to do so. In conclusion we quote and adopt the following language of the Supreme Court of the United States in the case of *Beyer v. LeFevre*, 186 U. S. 125. "In such actions" as this, say the Court, "the testator cannot be heard, and very trifling matters are often pressed upon the attention of the Court or jury as evidence of want of mental capacity or of the existence of undue influence. Whatever rule may obtain elsewhere, we wish it distinctly understood to be the rule of the Federal Courts that the will of a person found to be possessed of sound mind and memory is not to be set aside on evidence tending to show only a possibility or suspicion of undue influence. The expressed intentions of the testator should not be thwarted without clear reason."

The rulings appealed from must be affirmed.

*Rulings affirmed.*

(Decided January 12th, 1905.)

McSHERRY, C. J., dissents.