## LAURA B. MECUTCHEN, Caveatrix, *v.* WINTER GIGOUS et al., Executors, Caveatees.

*Wills—Mental Capacity—Undue Influence—Evidence.*

That testatrix failed to recognize old acquaintances, believed in spiritualism, occasionally paid bills twice, at times mumbled and was inattentive and, shortly after leaving her old home, appeared to be confused as to her whereabouts, did not show lack of mental capacity to make a will.                    pp. 84-86

All that is required of a testatrix is a capacity to determine to whom she wants her property to go after her death, and mere eccentricities or oddities, such as are to be found in people of ordinary sound mind, do not show lack of such capacity.

p. 87

That one having over fifty thousand dollars in property, and having an afflicted daughter, leaves to the latter only money for her support, one hundred dollars a month from the income, or from the principal in so far as necessary, together with such indefinite amounts as may be certified to be necessary for the daughter's medical treatment, and leaves the rest of her property to neighbors of whose household she has become a member, does not show mental incapacity.                    p. 88

The mental condition and any peculiarities of a testator may in some cases be such as to play a part in the procurement of a will by undue influence, even though not sufficient to support a finding that testator was not competent to make a will if left free to do as he might wish.                    p. 89

On an issue as to undue influence, exercised by the chief beneficiary in the will, with whom testatrix lived, evidence that the son of such beneficiary, when refusing to admit a caller to see testatrix, said that his mother was out and that he had orders not to admit any one to see testatrix until his mother returned, was admissible, since the jury might infer from the son's answering the call at the door, that he was authorized to deliver messages to callers.                    p. 90

On issues as to mental capacity and undue influence, evidence of the occasional failure of testatrix to recognize an old friend, and of her forgetting a purchase of flowers which she had made, was admissible for what it might be worth, in connection with evidence of other incidents. p. 90

On such issues, evidence as to what persons were present at the probate of the will was rightly excluded. p. 90

*Decided February 19th, 1926.*

Appeal from the Circuit Court for Prince George's County (MATTINGLY and LOKER, JJ.).

Caveat proceeding by Laura B. Mecutchen against Winter Gigous and the Fidelity Trust Company of Baltimore, executors, as regards an alleged will of Jemima Bartlett, deceased. From rulings in favor of the caveatees, the caveator appeals. Reversed in part.

The cause was argued before BOND, C. J., URNER, OFFUTT, DIGGES, PARKE, and WALSH, JJ.

*S. Marvin Peach,* for the appellant.

*M. Hampton Magruder,* with whom were *Max Rhoade, Lansdale G. Sasscer* and *Henry D. Harlan* on the brief, for the appellees.

BOND, C. J., delivered the opinion of the Court.

The chief question brought up by this appeal is one of the legal sufficiency of evidence produced by the caveatrix of a will, as proof of mental incompetency of the testatrix or of the procurement of the will by undue influence. The testatrix, Mrs. Jemima Bartlett, a widow about seventy-six years old, living at Brentwood, in Prince George's County, had one daughter, Mrs. Mecutchen, who has been of weak mind for thirty-one or thirty-two years, required to resort to a sanitarium at irregular intervals, and of late years

almost continuously confined there.  She was confined to the
sanitarium at the time of trial.  The mother, Mrs. Bartlett,
was possessed of an estate, of both real and personal prop-
erty, of a total value, as appraised, of $56,093.42.  She exe-
cuted her will on July 15th, 1924, at the house of a Mr.
Winter Gigous, where she was then living, in the presence
of three witnesses: Lloyd V. Moxley, of Brentwood; Judge
Isaac D. Arnold, of Brentwood; E. G. Lorenz, of Washing-
ton, D. C., and of Mr. Max Rhoade, an attorney.  The evi-
dence of the caveatrix (the defendants were not required to
produce any) shows that Mrs. Bartlett had the will on the
table, by her side, when the witnesses were there, that she
was asked by Mr. Rhoade whether she knew the contents,
and answered, "I know every word of it."  Moxley, the only
witness to the will who was called by the caveatrix to tes-
tify, said she talked, while waiting, of her old home in
England, and the pleasant days she had spent in her old
home at Brentwood.  And, in response to a direct question
as to the decedent's mental condition at the time, Moxley
answered, "With all fairness to everyone concerned in this
case, at that particular time, as I said before, gentlemen
of the jury, she appeared to be mentally sound, just at that
time.  I could not say whether she was before or what her
condition was after."  So much covers the testimony of the
execution of the will.  Mrs. Bartlett died five months later,
on December 13th, 1924, and the will was admitted to pro-
bate by the register of wills, during recess of the orphans'
court, five days later, on December 18th, 1924.  The orphans'
court ratified the probate on December 23rd, 1924.

The will gave three small legacies of $500 each, one to
a sister, one to a Dr. Mary Parsons of Washington, and one
to the town of Brentwood for fire-fighting facilities; and
two legacies of $100 each to Sophia Randall and Frank
Johnson, brother of the testatrix.  Then followed a legacy
of $10,000 to Mrs. Florence E. Gigous, described by the
testatrix as her "beloved friend," and one whom she had
intimately known for ten years, and had known nine years

before that, and with whom Mrs. Bartlett lived for the last
two years of her life.   An explanation was inserted, that
conditions in Mrs. Bartlett's own home had, by reason of
the daughter's unfortunate mental disease, become intoler-
able, and that the mother avoided these by moving into the
Gigous household.   In the event that Florence E. Gigous
should die before the testatrix the amount was to go to her
husband; and, if both should die before the testatrix, it was
to go to those who would take their personal estates upon
intestacy.   The residue, after that legacy of $10,000, was
to be placed in trust (Winter Gigous and the Fidelity Trust
Company, trustees) to pay $100 a month to the daughter
or her guardian or committee, the principal, however, to be
used if needed, without power of anticipation, and, in addi-
tion, such sum or sums as might be reasonably and abso-
lutely necessary for medical treatment, the necessity being
certified by three physicians.

There follows a recital that the daughter's condition, as
the mother is advised, is permanent and practically incur-
able, and that because of it the provisions of the will for
her benefit have been limited to such income and pro-
visions as the testatrix deems reasonable for her support.
And for the same reason trustees are authorized to suspend
and cease making payments to her personally if her mental
condition makes it inimical and undesirable in her own
welfare, the amounts then to be paid out on her behalf,
instead.   At the daughter's death all the property, with any
unexpended income, was to be paid over to Mr. and Mrs.
Gigous, or if they should then be dead, to their next of
kin.   Winter Gigous and the Fidelity Trust Company were
named as executors and trustees.

The caveat, as has been stated, has been filed in the name
of the daughter.   Trial on the two issues of mental capacity
and undue influence was had in the Circuit Court of Prince
George's County, and, at the conclusion of the evidence on
behalf of the caveatrix, the court directed the jury to answer
the issues in favor of mental capacity and against procure-

ment by undue influence. The court explained to the jury
that incidents and circumstances adduced to establish the
contrary were susceptible of other explanations, and the
mere fact that the jury might conclude, upon such under-
standing as they had of the circumstances, that they, in the
same situation, would have made greater provision for the
daughter, did not afford a ground for answering the issues
as demanded on behalf of the caveatrix. There was a sug-
gestion by the court that the daughter's husband, who testi-
fied, was bound to provide for her, but upon representation
of counsel for the caveatrix that he had been divorced, that
element was put aside. The husband was called to testify
as to the cost of maintaining his wife at the sanitarium, but
was not permitted to testify on the point.

In the incidents and circumstances adduced there is much
that is of little or no importance, but a brief summary of
all of it, on the question of mental capacity, at least, seems
necessary.

There was no expression of opinion by witnesses in the
case that the testatrix did not have the capacity which the
law requires. Unless we attach importance to a repetition by
one witness of a remark of her own that the testatrix was
childish—(but see *Berry Will Case,* 93 Md. 560, 583, and
*Gesell v. Baugher,* 100 Md. 677, 685)—there was no ex-
pression of opinion at all on the point of legal capacity,
except that of one of the attesting witnesses to the will, who,
called for the caveatrix, said the testatrix appeared at the
time of executing the will to be mentally sound, and he
could not say whether she was so before or after that. The
proof offered in the case consisted of scattered incidents
and remarks of the testatrix, mostly before the execution of
the will, and what is considered an otherwise unaccountable
preference of others, strangers to the blood, over the daugh-
ter of the testatrix. Such incidents and remarks, relied
upon to prove mental incapacity must be "inconsistent with
sanity," to serve for that purpose. *Davis v. Calvert,* 5 G. &
J. 269, 300. And in this case they must be sufficient to

support a finding of permanent insanity, because there is no evidence of insanity merely at the time of execution. *Gesell v. Baugher, supra,* page 687. Nearly every witness called testified to one or more failures of the testatrix during the years before making her will to recognize old acquaintances. In nearly every instance, this occurred when there had been no previous meeting for periods of from one and a half years to three years. It is common knowledge that such lapses occur with people who are otherwise perfectly competent, even much younger people. And it is significant that one of the witnesses here, Mrs. De Andelet, explained of an instance three years before the trial, that, "She either did not wish to speak to me, or did not know me"; and added: "She acted—but she had a way of doing that, but she had done that often times, she would know you one time and not know you the next, so I never knew when I spoke whether she would answer me or not, when I gave her a chance." It would seem to outreach the testimony on these lapses to say that it was, in itself, evidence of anything abnormal at all, and far outreach it to say that it was any evidence of incapacity to make a valid deed or contract. *Berry Will Case, supra,* page 573; *Stewart v. Redditt,* 3 Md. 67, 79; *Kennedy v. Dickey,* 100 Md. 152, 159. Two witnesses testified that the testatrix believed in spiritualism, and engaged in spiritualistic seances; but, certainly, that is no evidence of incapacity to make a valid deed or contract. It is well known that even people of very high capacity entertain such a belief. *Brown v. Ward,* 53 Md. 376, 393, 394. Beyond this testimony, there is evidence that during one witness' service as her agent, a period of thirteen or fourteen years, a grocer may have imposed on her, having borrowed money and then offset the debt with excessive charges; that she took a receipted bill, which she did not see, for an unpaid one, and ordered it paid without heeding explanations, and so confused receipts with bills at all times; forgot the payment of another bill in 1919; failed to distinguish on a plat between a block and a lot, the latter being intended; and was

impressed by the importunities of a salesman of oil stock, and asked her agent's advice on the purchase. The agent, during all those years, appears to have looked to the testatrix for his instructions; and he does not suggest that she was incapable of giving them. From another witness, there is evidence of a beating given to a dog which testatrix could not drive out of her yard, ten years before the trial, and then a fainting spell at the suggestion that her husband's spirit might be returning in the dog. From that it appears that the belief in spiritualism was not the outcome of late decay or incompetency, but rather one of long habit. Another witness testified to finding testatrix at home in great fear that some one was trying to put her away. That was two weeks after an effort had been made in the Circuit Court of Prince George's County to do that very thing, in the name of the daughter. *Daugherty v. Robinson,* 143 Md. 259, 265 ; *Gesell v. Baugher, supra,* p. 685. Another witness testified that testatrix, passing witness' house with a companion, continued mumbling when the companion several times remarked that it was a nice day, and that a physician had recommended to her, the witness, that she initiate proceedings to have the decedent adjudged incompetent, and trustees appointed for her property. But, certainly mumbling and inattention may be consistent with testamentary capacity, especially in one who is old and lives a more or less lonely life; and the hearsay recommendation of the physician is hardly legally sufficient evidence of actual incapacity.

The witness Moxley testified that the decedent, in 1922, was "muddled, reluctant or hesitated" when asked to give a piece of property for a public park (*Berry Will Case, supra,* page 581), and that half an hour after purchasing flowers at a lawn party, she had to be reminded of her purchase. That testimony would seem to be without legal value as evidence of lack of capacity to make a will; and it is the testimony of the witness who said, after all, that the testatrix appeared mentally sound at the time of executing her will, and that he could not say whether she was before or what,

her condition was after. Finally, the witness Mecutchen testified that when he saw the decedent at Mr. Gigous' house just after she had gone there in 1922, she seemed partly confused, and spoke as if she did not quite know where she was. She spoke of her girlhood home in Warsaw, and then of her later home in Brentwood, and did not quite seem to know in whose house she was, or where she was. This impression made on the witness Mecutchen comes nearest to evidence of incapacity. But is it alone, or in conjunction with anything in the case, legally sufficient as evidence of incompetency at the time of executing this will—which is the issue? The testatrix had just given up living at her family home, where her husband, her children and she herself had passed a great part of their lives together, and where she finally found herself alone, except when a daughter of weak mind was at home with her, and that was seldom in these late years. The woman must have been undergoing a strain. And this being true, can evidence of incapacity to make a valid deed or contract then, or eighteen months later, when she came to make her will, be found in the impression made on this witness that she was confused as to her whereabouts then?

In Maryland, we customarily take our statements of the law on proof of mental capacity to make a will from the expressions of Chief Judge Buchanan, in *Davis v. Calvert,* 5 G. & J. 269. The formulas which run through all our subsequent decisions may be read there, and it seems unnecessary to repeat them here at any length. But it has never been intended to require under these formulas any extraordinary mental capacity for making a will. *Jones v. Collins,* 94 Md. 403; *Higgins v. Carleton,* 28 Md. 115. Making a will requires no greater capacity than making a gift. And it may be a very simple act. If the devolution of title is followed far, or trusts are made use of, then the draftsman may have difficulty in phrasing his document in order to meet the constructions placed on the language of wills in the decisions, but all that is required of a testatrix is a

capacity to determine to whom she wants her property to go
after her death. And it is not mere eccentricities or oddi-
ties, such as are to be found in people of ordinary sound
minds,,that will show lack of such capacity. *Jones v. Col-
lins, supra.* If it were, then few wills could be sustained,
for few testators can hope to pass their lives without odd
actions and remarks at times, which, collected and solemnly
recounted and recorded in a court room, will serve as ground
for setting aside their wills. "Conversations or actions, or
declarations of the testator inconsistent with sanity," are
alone those which serve as proof of incapacity (*Davis v.
Calvert, supra,* 300), not those which occur in sane people.

The law has surrounded the making of wills with excep-
tional safeguarding formalities, to give assurance of capac-
ity, by requiring the presence and attestation of witnesses
who are to satisfy themselves of the fact. The witnesses
were present at the execution of this will, and the only one
who has testified has stated that the testatrix appeared
mentally sound. To the assurance thus provided for, and
obtained, there is added a presumption of mental capacity.
*Cramer v. Crumbaugh,* 3 Md. 491; *Taylor v. Creswell,* 45
Md. 430; *Jones v. Collins, supra; Gesell v. Baugher, supra,*
p. 677. And that presumption, so supported, should have
some meaning. It seems inconsistent with the special pre-
cautions provided, that trifling incidents in the lives of
testators should, after they are no longer here to defend
their wills, be treated as sufficient to set them aside. *Kelley
v. Stanton,* 141 Md. 384, 396, 397; *Gesell v. Baugher, supra,*
p. 684.

So much refers only to the scattered incidents in the life
of the testatrix, before and after the execution of the will,
offered to shed light on her capacity at the time of execu-
tion. But a provision in a will itself may furnish some
evidence on the point, and such is the main reliance in
the attack on this will. "But a will or testament may," said
Chief Judge Buchanan, "by its provisions, furnish intrinsic
evidence, involving it in suspicion, and tending to show

the incapacity of the testator to make a disposition of his estate with judgment and understanding, in reference to the amount and situation of his property, and the relative claims of the different persons who should have been the objects of his bounty—such as a disposition of his whole estate to the exclusion of near and dear relations, having the strongest natural claims upon his affection: a wife and children for instance, or other near relations, without any apparent or known cause, which alone would be a suspicious circumstance, although not furnishing *per se* sufficient ground for setting aside the instrument." *Davis v. Calvert, supra,* page 300; *Cramer v. Crumbaugh,* 3 Md. 491; *Hiss v. Weik,* 78 Md. 439, 448; *Gesell v. Baugher, supra,* p. 687. And the facts are that a testatrix with over $50,000 in property, and having an afflicted daughter, leaves her only money for her support: $100 a month from the income, or from the principal in so far as it may be necessary, together with such indefinite amounts as may be certified to be necessary for the daughter's medical treatment, and leaves the remainder of her property to neighbors of whose household she had become a member. The explanation is rational enough, however imprudent or partial the provision may seem on its face. And whatever may be the possibilities of its having been brought about by undue influence, the majority of the court, after considering the arrangement in the light of all the other evidence, concur in the conclusion of the trial court that the arrangement does not furnish evidence of mental incapacity. *Gesell v. Baugher, supra,* p. 688. We refrain from any further discussion of it in view of the conclusion to be stated later that there should be a retrial.

The conclusion of the majority on all the evidence in the case is that the court below committed no error in directing that the issue of mental capacity of the testatrix be answered in favor of capacity and that ruling will be affirmed.

But on the question of procurement of the will by undue influence, the conclusion of a majority of the judges is that the record contains some evidence which should have

been referred to the consideration of the jury, together with whatever evidence there might be opposed to it. On this point, the testimony will not be rehearsed in much detail. This Court has repeatedly stated that it regarded a brief summary as preferable in an opinion holding evidence on such issues sufficient for consideration by a jury. *Somers v. McCready,* 96 Md. 437, 441; *Hiss v. Weik,* 78 Md. 439, 453; *Moore v. McDonald,* 68 Md. 321, 341; *Stirling v. Stirling,* 64 Md. 138, 150. And that course will be followed here.

The evidence offered on the mental condition of the testatrix has been reviewed, and need not be repeated. The mental condition and any peculiarities of a testator may in some cases be such as to play a part in the procurement of a will by undue influence, even though it is not sufficient to support a finding that the testator in a particular case was not competent to make a will, if left free to do it as he might wish. In addition to the evidence on that subject, there was, in the opinion of the majority, evidence from which it might be found by a jury that after having taken up her residence in the Gigous house, the testatrix looked to Mr. Gigous, in some instances, at least, for direction as to her course of action on matters submitted by her regular business agent; that a neighbor calling was refused admittance to the testatrix during Mrs. Gigous' absence; that Mrs. Gigous remained in the presence of the testatrix while another witness was calling. The provision made in the will for the daughter might be found inconsistent with the previously declared intentions of the testatrix, as well as with the natural course for a mother providing for a daughter in that condition. And, of course, the opportunity which residence in the Gigous house gave for the exercise of undue influence is a fact that may be considered. The majority think there was error in withdrawing this evidence from the jury, and the ruling in that respect is reversed.

As the case must be retried, we shall pass briefly on exceptions to the evidence. The first, to the exclusion of the

statement by Mrs. Gigous' son, that he could not admit a caller to see Mrs. Bartlett, because his mother was out and he had orders that no one was to see Mrs. Bartlett until the mother returned, is unimportant on this appeal, as substantially the same testimony was admitted, without objection, in the witness' later statement that the young man told her to come back in half an hour and the mother would let the witness see Mrs. Bartlett. But on a retrial the evidence should, in our opinion, be admitted, inasmuch as the jury may infer from the son's answering the call at the door, that he was authorized to deliver messages to callers.

The exclusion of evidence of a failure of the testatrix to recognize Mrs. De Andelet, sometimes, and of her forgetting the purchase of flowers, was, we think, erroneous. The evidence should have been received for what it might be worth in connection with evidence of other incidents. The objection to the admission of evidence as to what persons were present at the probate of the will before the register of wills, seems to us well founded. We do not see the materiality of this last evidence.

> *Rulings affirmed in part and reversed in part, as specified in this opinion, and new trial ordered, appellees to pay costs.*

---

Offutt and Parke, JJ., dissent from the conclusion of the majority of the Court on the question of the legal sufficiency of the evidence offered to prove mental incapacity of the testatrix.