GEORGE R. CALLIS, 3RD, ET AL. *v.* BENJAMIN F. THOMAS ET AL., ADMINISTRATORS, ET AL.

[No. 67, October Term, 1927.]

230

*Decided January 11th, 1928.*

The cause was argued before Bond, C. J., Pattison, Urner, Adkins, Offutt, Digges, Parke, and Sloan, JJ.

*Paul R. Kach,* with whom was *Joseph S. Knapp, Jr.,* on the brief, for the appellants.

*W. Leslie Prout,* with whom were *Tolson & Tolson* on the brief, for the appellees.

Bond, C. J., delivered the opinion of the Court.

The decree appealed from is one setting aside a deed of trust made for the benefit of the grantor for life, with remainders in the principal to remote relatives and friends and a church, to the exclusion of his wife and children. The children are complainants in a bill brought after the death of the grantor, and also after the death of his wife, to set aside the deed; and they contend that the grantor was at the time of execution mentally incapable of making such a deed, and that its execution was procured by undue influence exerted upon him by the grantees. The deed was executed on January 23rd, 1923, and there was testimony of unusual conduct on the grantor's part in 1920 and shortly before, confinement in a hospital for the insane for the first six months of 1920, and some unusual conduct after 1920; and, on the other hand, testimony of actual management of business transactions in a capable manner in 1921 and 1922, sales of property in conjunction with the wife, and a division of property and separation agreement made with her in 1922. On the testimony in the case this court has come to the conclusion that the averments of incompetency and undue influence have not been proved.

Benjamin F. Thomas, Sr., the grantor, was a farmer, and from 1906 to 1920 had lived with his family on a farm near Brooklyn, in Anne Arundel County. In 1915 he made a will, which he never later destroyed or expressly revoked, giving his property to his wife for life with remainders to his children. And testimony of friends was to the effect that the father, mother, and children all lived together congenially, up to this time, at least. In 1917, Thomas suffered a stroke of paralysis, from which he seems to have recovered physically, but there was some testimony of a change in attitude toward his wife and children, and testimony of talkativeness, dwelling on trifles, and a disposition to tell his troubles and ask advice of any one, so that men avoided talking with him. Some of the testimony seems to show that similar conduct was observable before 1917, to some extent. And there was testimony of persons who saw him frequently

during the last two years of his life that he talked much of trifling things, not sensibly, that he carried about with him a collection of newspaper clippings, and tried to engage others in conversation on them, that he entered too freely in private rooms in houses where he boarded, and took his choice of family chairs, and that he made a practice of attending funerals, not always of relatives or friends, and when he did attend was heedlessly noisy and had to be quieted for the services. All testimony of the wife and children as to actions or statements of the grantor was excluded under the provisions of article 35, section 3, of the Code, as was also the testimony of the grantees on their side to actions and statements later, and the effect of this, of course, has been to exclude from the case the testimony of those who have knowledge of most of the facts bearing on the questions presented. We cannot, of course, conjecture what this testimony might have proved or failed to prove. And taking the testimony as it stands, while it naturally raises a question of competency, we do not see that it shows peculiar conduct which we might say was inconsistent with competency; it does not appear to be such as cannot be met with in competent men. Common experience teaches us that a considerable degree of peculiarity, eccentricity, unreasonableness, pettiness, or deviation from ordinary, normal conduct, may be associated with sufficient ability to make an ordinary deed, contract or gift, and sometimes with extraordinary ability. And this fact the law recognizes fully, although there is often a tendency to lose sight of it in court. As Judge Pearce said in *Jones v. Collins,* 94 Md. 403, 409, in considering an instruction prayed on testamentary capacity, "the test is not whether the testator is 'entirely sane,' but whether he is 'of sound and disposing mind, and capable of executing a valid deed or contract.'" There may be a difference. *Brashears v. Orme,* 93 Md. 442, 449; *Wood v. Hankey,* 133 Md. 389, 394; *Mecutchen v. Gigous,* 150 Md. 79, 87. The fact that after such a long life without serious family dissension—so far as appears now—the man fell out with all his family, is another fact to be weighed against competency, for

habit if not affection usually holds a family of normal people together at that stage; but the evidence is not sufficient to enable a court to estimate the weight of this. Possibly the father may have had some grievance, and that possibility must be allowed for. He himself complained of his family on different grounds, some of them seeming petty and unreasonable, and all referring to some only and not all of those with whom he quarreled; in the hospital he said that he had nothing to do with his wife for years because of a dispute over the method of milking a cow, and again complained that his daughter hid his blanket. Later, long after leaving the hospital, he said friction had arisen from the insistence of his sons upon taking charge of the farm and running it on modern methods. In reviewing these complaints, trifling as they sound, we have to bear in mind a common capacity in sane people, especially people living more or less shut-in lives, to magnify trifles and to make petty complaints in family quarrels.

The opinions expressed by physicians who examined the man for his competency are much more important.

In December, 1920, Dr. Brawshaw of Anne Arundel County took the grantor to be examined by Dr. Spear of Baltimore, an alienist, and, upon the history given and a comparatively slight personal examination permitted, Dr. Spear certified that the man was incompetent and should be confined, and, upon a like certificate from Dr. Herring, Thomas was taken to Spring Grove State Hospital for the insane. No evidence is given of Dr. Herring's examination. Dr. Spear was permitted to make his examination of the man only on the street, as the man was sitting in an automobile, because the man would not go into the doctor's office. The doctor found him suffering with hardened arteries, seventy-one years old, and expressing antipathy to his family; and, putting these facts together with the history given, but which was excluded from the trial as hearsay evidence, Dr. Spear concluded the man had become insane, or sustained a senile breakdown, as a result of the processes of age, manifested physically in arterio-sclerosis. At the hospital

the superintendent, Dr. Wade, and the admitting physician, Dr. Garrett, made more thorough examinations and came to the same conclusion as that of Dr. Spear. More specifically Dr. Wade testified that they found Thomas suffering from a senile psychosis, paranoid type, delusions and hallucinations, with well-marked arterio-sclerosis. In addition to the history given him, Dr. Wade observed for himself a loss of memory for recent occurrences, an antagonism to his family, based by the patient on the trifling or petty grounds already recited. Dr. Wade added that the man blamed his wife and children for his confinement, and that was the subject of his conversation in the hospital. Dr. Garrett's examination, like Dr. Spear's, was based upon more limited personal observations and more largely upon the history of the case, which was excluded from the evidence. It being the opinion of these three physicians that Thomas was incompetent when he entered and remained in the hospital, in 1920 and 1921, they were asked their opinion further on the probabilities as to the condition with which this case is finally concerned, the condition in January, 1923, and all agreed in an opinion that the condition they observed was permanent in its nature and progressive, and that the grantor would not possess the requisite capacity at the time of executing the deed in 1923. As one of the physicians expressed it, the condition was the result of age, and the man could not grow younger. Dr. Spear expressed a readiness to base this conclusion on his examination of the man irrespective of the history given. An expert called by the defense, Dr. Taneyhill, expressed an opinion that nothing in the sclerotic condition described in the evidence or in the other symptoms mentioned in court would differentiate this man from many other men of the same age, or justify a conclusion that there was a permanent, progressive mental impairment, that, on the other hand, the condition described might improve, as such a condition often does.

In June, 1921, upon being brought before the court on a writ of habeas corpus, sued out by Edward F. Callis, Thomas was released after a conference between the court and Dr.

Wade, but without any adjudication upon the question of insanity. While at the hospital, he was one of the patients allowed to move about, and he visited freely at the house of Miss Bertha McFee, one of the beneficiaries under the deed of 1923, in Catonsville, near which the hospital is situated, and there he met the other beneficiaries, George R. Callis, 3d., a third cousin, and Edward F. Callis, a first cousin, uncle of George R. Callis. Miss McFee is stated to be a sister of one Callis. George R. and Edward F. Callis had made two visits each to the Thomas farm, principally on gunning trips, and they were only slightly known to the family, even to the father, before 1920. The members of the family had never known Miss McFee.

After his release from the hospital, Thomas boarded at various places in Baltimore City, avoiding his family. There was testimony that two of the sons tried to persuade him to go home with them but failed. The defendants showed that in September, 1921, Thomas and his wife united in the sale of four acres of land which had been added to their farm by recession of the waters of the Patapsco River, and, of course, executed a deed jointly, acknowledging it before a notary public. And dealers in real estate, called for the defendants, testified that in 1921 he took up with them the sale of the farm itself and ultimately effected a sale of it, and exhibited ordinary and sufficient business capacity in the transaction. He talked with Theophilus White and John K. Culver, president and treasurer of a Brooklyn-Curtis Bay Land Company, had them visit the farm several times, and discussed development or sale there with them and also with Mrs. Thomas. In 1922 he made many visits to the offices of the Continental Trust Company of which Mr. White was a vice-president, talked in an ordinary business-like way of the farm, his (Thomas') price, and terms on which he would sell, held out for a greater price than White offered, and finally obtained his price. The sale was consummated at a conference at the Title Guarantee and Trust Company, of Baltimore, at which Thomas and his wife were both present and represented by different attorneys. And all through these

negotiations and dealings Thomas, according to the testimony, appeared to be an ordinary competent man, and was accepted as such. On the same day Thomas and Mrs. Thomas united in executing an agreement in which they acknowledged an equal division of the proceeds of the sale of the farm, and released each other from claims or demands for support or otherwise.

The deed of trust was executed eight months later. George R. Callis, after having made an appointment with an attorney, Mr. Knapp, went with the grantor and turned him over to Mr. Knapp, who had a series of conferences with Thomas and as a result prepared the deed. Thomas appears to have explained that he wanted to dispose of all his property, retaining the income for life, and giving remainders as they were finally given, excluding his wife and children from participation. He explained that he had had friction with his family arising from the desire of the sons to take over the management of the farm, and that the Callises and Miss McFee had befriended him while he was confined to the hospital, he having visited at their house nearly every day, and Edward P. Callis having been finally instrumental in having him released. The deed, when prepared, was read and explained to Thomas, and then, in view of his previous confinement, Mr. W. Harry Noeth, an attorney, notary public, and officer of the Maryland Title Company, at the instance of Mr. Knapp, took the grantor into the title company's office and questioned him separately on his knowledge and understanding of what he was about to do. Thomas explained that the purpose of the deed was to do what it did do, exclude his wife and children. And the attorneys then had him execute the deed.

It is an irrevocable gift, with directions to the trustee named to pay over the net income to the grantor for life and part of the corpus, if necessary for the grantor's maintenance and support, and denying to the grantor all power to charge or anticipate any part. The remainder to the church was conditioned upon the survival of Dr. R. S. Coe and his continuance as pastor of the church, and testimony showed that

the Dr. Coe who had been pastor had left the church two years before, and that his name was Samuel W. Coe. There was testimony given, also, that three years after execution of the deed the grantor expressed an understanding that it was revocable, and said he thought of revoking it because he felt the trustee was not giving him as much money as he should. The grantor was struck by an automobile and killed on January 6th, 1926.

It appears to us on the whole testimony that this grantor, at the time of execution of the deed, was a man of some peculiarities of conduct, not necessarily indicative of such weakness as to render him incompetent to execute the deed, that, however his condition may have appeared in 1920 and early in 1921, he did in 1921 and 1922, contrary to the past fears of the physicians, actually conduct business dealings with business men and attorneys in a capable manner, without conveying to their minds any suggestion that he might be incapable and that therefore their transactions might be invalid, and that his wife, who probably knew his condition more intimately than any one else, united in business transactions with him. It is conceivable that the wife would in this be doing only what others advised, but that means that these others and her attorneys did not consider that there was any obstacle in the husband's mental condition. The past fears of the physicians appear to us from these facts to have been contradicted by the actual outcome, and we doubt whether with that outcome before them they would upon an examination in 1923 have pronounced the man incompetent.

The deed itself seems a somewhat strange instrument because of its preference of recent friends, its lack of any power of revocation, and its attempt to restrict the grantor's own power of anticipation and alienation, provisions which seem to go beyond the grantor's purposes and benefit the remaindermen. It may be considered an improvident and unwise deed. But the grantor was old and might desire the protection of restricting clauses, and some allowance must be made for an attorney's choice of means to accomplish the grantor's purposes. And as to the exclusion of the family,

it is to be remembered that this was not the first instrument made in consequence of the family dissension. The separation agreement, in which the wife joined, was an earlier settlement upon the basis of the quarrel, and, so far as the wife was concerned, might have been considered a consummation of it to which the later deed disregarding the wife was a natural sequel. We think it cannot be said to indicate mental incompetency in the grantor.

On the whole evidence, therefore, while there is matter for consideration and perhaps for suspicion on the question, there seems to be insufficient basis for a judicial finding of fact that this grantor was incapable of executing a deed such as this in January, 1923.

On the question of procurement of the deed by the exercise of undue influence, the deed itself is the only substantial evidence to be considered. There is no evidence of dealings between the grantor and the beneficiaries in relation to the transaction, except the one fact that George R. Callis made an appointment with an attorney for the grantor and took him to the attorney's office. The provisions of the deed do, we think, arouse a suspicion, and possibly an expectation, that the full facts would show its procurement by undue influence, for they appear to restrict the grantor's further rights in his property further than necessary for the purpose he stated, and these restrictions are for the benefit of the remaindermen. And when it is recalled that the grantor was a man who impressed some as weak, the suspicion and expectation may be increased. But the court must have more than ordinary suspicion to act on. The case is not one in which the parties stood in a confidential relation, so that the grantees are required to disprove the exercise of undue influence; it does not appear that any influence the remaindermen might have exercised by reason of the friendship and hospitality they gave the man two years before, while he was confined in the hospital, continued up to the time of the deed. And it is conceivable that this deed might have been made by an old man to his friends; and, that being so, it cannot be said that its provisions, coupled with the fact that one of the friends

took him to an attorney, show the exercise of undue influence. Against a judicial finding now of such influence there would be the fact of the careful private questioning to which the man was put without disclosing any lack of volition on his own part; and such an inquiry at the time, if conducted honestly and thoroughly, would be much more dependable than one conducted after the grantor's death through witnesses *pro* and *con,* and so is persuasive. *Henry v. Leech,* 123 Md. 436. For these reasons we conclude we cannot find procurement of the deed by the exercise of undue influence to be established as a fact.

*Decree reversed and bill of complaint dismissed, with costs to the appellants.*