# GILBERT J. COLBURN ET AL. *v.* JULIA MARGARET ELLERS ET AL.

[No. 56, October Term, 1930.]

*Decided January 13th, 1931.*

The cause was argued before BOND, C. J., PATTISON, URNER, ADKINS, OFFUTT, DIGGES, and SLOAN, JJ.

*Charles W. Main* and *John S. Strahorn,* for the appellants.

*Nicholas H. Green,* for the appellees.

OFFUTT, J., delivered the opinion of the Court.

Milton F. Colburn, a widower, died at his home, 114 Cathedral Street, Annapolis, Md., on June 27th, 1926, in his seventy-ninth year. He had been twice married, and three children of the first marriage, Gilbert J., Milton F. Colburn, and Elizabeth E. Krouse, and seven of the second, Mary, the wife of Angelo Geraci, Margaret, the wife of William Ellers, Della, the wife of Charles Staff, and James B., Harry V., David O., and William J. Colburn, survived him.

Throughout the earning period of his life he was employed in some form of railroad work, for a time as an engineer, later as a motorman, and finally as a flagman or crossing watchman.

He led an active, hard, and at time hazardous life, and in the course of it suffered on several occasions accidental injuries. But while those injuries left certain manual disabilities, his general health appears to have been good until the latter part of 1924, when he suffered a stroke of paralysis. He never fully recovered from that attack, and although after it for a time he was able to get about and to converse, his progress was slow and uncertain, and his speech difficult, and at times unintelligible except to those with whom he was in immediate and daily contact.

After the death of his second wife, he continued to live in the Cathedral Street house, although as his children grew up and made homes of their own his family became smaller, until there were left only Margaret Ellers and her husband, and Mrs. Staff, and they remained with him to the end.

While he accumulated a small personal estate, the only property of substantial value which he owned was the Cathedral Street home.

Some five or six months after he had been first stricken with paralysis, Mr. Colburn sent for Mr. Nicholas H. Green, a well-known and highly respected member of the bar, and directed him to prepare a deed conveying the Cathedral Street property to his daughter Julia Margaret Ellers, subject to a life estate in the grantor. The deed was prepared, and on May 29th, 1925, duly executed and recorded, and something over a year later, on June 27th, 1926, the grantor died.

On December 30th, 1926, a bill of complaint was filed in the Circuit Court for Anne Arundel County, in which Gilbert J., Harry V., James B., David O., William J., and Milton F. Colburn, and Elizabeth E. Krouse were named as complainants, and Julia Margaret Ellers and William, her husband, and Della Staff, defendants. Later James B., David O., and William A. Colburn filed a petition stating that they had been joined as parties plaintiff without their knowledge or consent, and praying the court to order their names stricken from the cause as parties plaintiff, which was done.

The plaintiffs in their bill alleged that, at the time he executed the deed to Mrs. Ellers, Mr. Colburn was so infirm and helpless in body, and that his mind was so "enfeebled and impaired," that he was wholly incapable of making a valid deed or contract, and that, while he was in that state, he was induced to execute it through the fraud and misrepresentation of the defendants. Later the bill was amended so as to charge that the deed was procured through the "fraud, misrepresentation and undue influence of the defendants or some of them, conspiring together." The defendants answered the original and amended bills, and in their answers denied that, when he executed the deed to Mrs. Ellers, Milton F. Colburn was incapable of executing a valid deed or contract, and they denied that its execution had been induced through fraud, misrepresentation, or undue influence, exercised or practiced upon him by any one. The case was tried

upon those issues, and at the conclusion of the trial the chancellor dismissed the bill. The appeal is from that decree.

The picture which the record presents is that of an old man, who had led an active laborious life, and who at the end of it found himself enfeebled by disease, irritable, short tempered, difficult to bear with, but nevertheless needing constant and loving care and attention. He was possessed of a small estate, with no resources sufficient to permit him to buy that attention from strangers, but he did receive it from two of his daughters, Della, who was married to Charles Staff, and Margaret Julia, the wife of William Ellers, who lived in his home with him. His small estate, if divided among his ten children, would have given to each of these daughters a sum wholly inadequate to reward them for their loyal and faithful service. He was conscious of that, and he repeatedly expressed the intention of giving to them the house in which he lived, and that purpose appears to have been accepted, by at least one of the appellants, James B. Colburn, who testified in the case, as just, fair, and appropriate. The deed which is the subject of this proceeding was the consummation of that purpose.

The appellants attack it upon two inconsistent grounds, one that the grantor lacked the mental capacity to validly execute it, the other that it was induced by undue influence and fraud.

The contention that the grantor was mentally incompetent at the time he executed the deed appears to rest upon the theory that his age and his physical debility were sufficient in themselves to justify such an inference. But the law is otherwise. While extreme physical weakness due to age, casualty, or disease is a relevant circumstance, to be weighed and considered in determining the existence of that degree of mental capacity required for the execution of a valid deed or contract, it is not necessarily conclusive nor even controlling. In *Higgins v. Carlton,* 28 Md. 115, it was stated in the caveatees' seventh prayer, which this court approved, that "neither age nor sickness, nor extreme distress, nor debility of body, will affect the capacity to make a will if sufficient intelligence

remain." And in *Underhill on Wills* the same principle is expressed in the following language: "But physical weakness, whether arising from injuries caused by accident, or from illness or old age, while material to be considered upon the question of capacity and of undue influence, is not conclusive as to either. It is well settled that a person may enjoy full testamentary capacity while he is suffering from extreme physical weakness or from the violence of disease. He may have been in an extreme state of weakness, bedridden and speechless, utterly unable to move his limbs or to raise his hands to grasp the pen with which the signature to the will is made, and yet execute a valid will."

In the absence of proof of prior mental incompetence permanent in its nature, in the trial of any issue involving a want of mental capacity to execute a valid deed or contract at a given time, the burden of proving the absence of such capacity is upon the person alleging it. For the law presumes every man to be sane and capable of making a valid deed, contract or will. *Scheller v. Schindel,* 153 Md. 582, 138 A. 415; *Bell v. Wolfkill,* 152 Md. 416, 137 A. 35; *Smith v. Schuppner,* 125 Md. 417, 93 A. 514.

The appellants offered only three witnesses whose testimony had any possible connection with the issue of mental capacity. Of these James B. Colburn, a son and one of the appellants, after testifying that Mr. and Mrs. Ellers, Della Staff, Walter H. Myers, a friend, Myrtle Sturm, a notary, Nicholas H. Green, a lawyer, and the witness, were present, gave the following account of the circumstances surrounding the actual execution of the deed: "Mr. Green asked my father, said, 'Mr. Colburn, I understand you want the deed of this property to your daughter, Mrs. Margaret Ellers?' and my father shook his head 'Yes,' and he said, 'Do you want Mrs. Staff's name in this,' and my father said 'No.' Mr. Ellers was sitting in the chair, and he wanted to know if he wanted Mr. Staff's name and he said 'No.' Mr. Green said, 'You just want Margaret Ellers' alone,' and he said, 'Yes,' and Mr. Green repeated it over a second time. Mr. Green said, Mr. Colburn I want to advise you this, for him to keep a life

estate which was done. He asked him a second time if he wanted Della's or Bill's name, and he said 'No, just Maggie's and Maggie's alone,' and he seemed to sit there and know exactly what he was doing, that is the way it appeared to me at that time, it certainly did. I was glad he did it, and when Mr. Green went out I grabbed Maggie in my arms and danced around and said I am glad they did it, they can't take it away from you now. * * * I don't remember whether a day or so after, not very long afterwards, he came over home, came up the alley like he was despondent, like he was sorry, he said he had had something, now he ain't got nothing. I said, 'Yes; you have as long as you live,' I said, 'you have not done anything wrong, you have done perfectly right, you knew what you were doing, Mr. Green sat there and asked you questions, you had witnesses, you kept your mind right to that one, which Della had asked you to give it to.'" He was not asked directly to express any opinion as to his father's mental condition at the time that deed was executed, although he was asked if his father was mentally competent when, at a time stated to be about a year after he had been paralyzed, he executed a deed conveying a small strip of land to the witness, and he replied that he was. The deed to the witness was in fact made before his father was stricken, but his answer indicated that in his opinion at least his father would have been as competent to execute it after as before he was stricken with paralysis.

Harry V. or B. Colburn, another son and one of the appellants, when asked as to his father's ability to execute the deed in issue here, said: "I thought in a case of that kind it could not be legal because he could not, at that time, deliver his speech and he could not dictate to any one. Q. At the time this deed was drawn, a year after your father's stroke, in your opinion, was your father capable or incapable of executing a valid deed or contract? A. How do you mean, mentally? Or what? I should not think so according to the condition as far as his speech was concerned, that was my opinion. Q. Do you think mentally he could? A. I don't know

about that. Q. You don't know about that? A. No, sir. Far as his mind is concerned I think his mind was all right."

A third son, Gilbert J. Colburn, also an appellant, was the only witness in the case who appeared to have had any doubt as to his father's mental capacity. He testified that after he had been paralyzed his father seemed to be "like a child ten or twelve years of age, very childish." When asked in what way he acted like a child, he said, "just like old people, if you humor him he was all right, he needed a lot and he got a lot"; that he would "sit there and grin childish like, you know what old people are, you have been around them, he acted childish, needed a lot of humoring," and he added that at times during his "sickness he had to be tended to same as a new-born child," and had to be assisted in certain acts essential to the proper care of his person.

For the appellees, Dr. James J. Murphy, the grantor's attending physician, who had known him for thirty-two years, Nicholas H. Green, his counsel, who had known him for fifty years, Myrtle Strum, the notary public, who had known him for twelve years, Walter H. Myers, a friend, who had known him all his (Myers') life, Mary E. Geraci, Julia Margaret Ellers, his children, and William, the husband of Margaret Ellers, all testified that at the time he executed the deed to Mrs. Ellers, Milton F. Colburn, her father, was mentally competent. The only possible conclusion from that evidence, considered in connection with other evidence in the case relating to his physical condition, is that while, at the time the deed was executed, the grantor was suffering from the effects of a paralytic stroke which affected his movements and his speech, he was mentally competent to execute it.

The second ground upon which the appellants attacked the deed was that the grantor was induced through the "fraud, misrepresentation and undue influence of the defendants or some of them, conspiring together" to sign it. The evidence failed to show a single fact or circumstance sufficient to support the allegation that the deed was the result of a conspiracy, or that its execution was induced by fraud or misrepresentation, but in so far as it was relevant to that contention

at all related exclusively to the charge that the deed had been induced by undue influence.

In dealing with that question it may be assumed that Mrs. Ellers stood in a confidential relation to her father (*Upman v. Thomey,* 145 Md. 360, 125 A. 860), and that she carried the burden of showing by satisfactory evidence that the transaction was fair, voluntary, and free from any taint of fraud, coercion or overreaching. *Todd v. Grove,* 33 Md. 195; *Kerby v. Kerby,* 57 Md. 350; *Whitridge v. Whitridge,* 76 Md. 54, 24 A. 645. But if it appears that that burden has been fairly met, the deed should be sustained. *Myers v. Myers,* 128 Md. 264, 97 A. 435. In the consideration of that question, such facts as that the deed was executed in furtherance of a settled purpose (*Myers v. Myers,* 128 Md. 264, 97 A. 435; *Fakle v. Reynolds,* 54 Md. 311; *Bauer v. Bauer,* 82 Md. 241, 33 A. 643; *Cherbonnier v. Evitts,* 56 Md. 279), that at the time it was executed the grantor had the benefit of independent advice and time to consider the nature and character of his act (*Callis v. Thomas,* 154 Md. 236, 140 A. 59; *Kerby v. Kerby, supra*), as well as his physical and mental condition at the time of the execution of the instrument, and the circumstances surrounding the act of execution itself, his previous life, habits, and relation to others who would be the natural or probable objects of his bounty, are relevant and material. Applying those principles to the evidence before us, we have had no difficulty in reaching the conclusion that the deed from Milton F. Colburn to his daughter, Margaret Julia Ellers, was free from any taint of fraud or undue influence, that it was fair, and that it was his voluntary and deliberate act.

Without reciting it in detail, it is sufficient to say that the evidence established the fact that it had been the settled and deliberate purpose of the grantor to convey the property to his two daughters, Julia Margaret Ellers and Della Staff; that he abandoned that purpose only after Della Staff had positively refused to accept a grant of any interest in the property, because she was unwilling that it should be affected by any rights in it which might accrue to her husband if any

interest in it were granted to her; and that, after the grantor had been informed, of her decision, he decided to grant the whole of it to his daughter, Mrs. Ellers. And when his previous life, his habits, his situation at the time, and his relation to his other children are considered, it cannot be said that that purpose was either unnatural or unfair. His other children had all left his home, and while his relations with them were friendly and affectionate, he depended for the care and assistance which his age and enfeebled condition demanded upon his two daughters, Julia Margaret and Della, who remained with him. It also appears that they were unwearying in their attention to him and that he was devotedly attached to them. Under such circumstances, it was not unnatural that he should have determined to grant them the property as a reward for their services and devotion, or that, when Della was unwilling to accept any interest in it, that he should have granted the whole of it to Mrs. Ellers. There was not the slightest suggestion that Mrs. Ellers herself solicited the grant, or that she consciously exerted any influence to procure it.

Aside from such inferences as may have been drawn from the physical condition of the grantor and his relation to the parties to this proceeding and his other children, the appellants, in support of their allegation that the deed was procured by undue influence, rely mainly upon the testimony of James B. Colburn, an appellant, who testified that Mrs. Staff had said that she had seen her father was not "going to do anything" and that she had made up her mind to see that he did, that she had "been raising hell over there and was going to continue to," and that after the deed was executed she said: "Yes, I did it, and I am very glad of it, and nobody else did it." But not only is that testimony of the witness contradicted by Mrs. Staff, but considered as a whole the testimony of the witness, in so far as it is entitled to any weight at all, tends to show that the deed was the free voluntary act of the grantor executed in pursuance of a settled purpose which he himself had formed.

He said that his father had told him many times that he did not want any of witness' brothers to have the property, and that "it looked like my father was not going to make the will or deed to these two girls, they worked hard and took abuse from him, nobody knew what they put up with, no maniac could go on worse at times, he did not feel right, they threatened to leave him several times, but they were not going to do it, and I said 'Pop, you should do different, here are these two girls doing for you, and no one in the land could have better treatment or a cleaner home, why don't you try to do better.'" He further testified that he, at his father's request, summoned the lawyer who prepared the deed, was present when the lawyer was instructed by the grantor as to the purpose and effect of the deed, and was present when it was executed, and that not only did he fail to protest, but to quote him: "I was glad he did it and when Mr. Green went out I grabbed Maggie in my arms and danced around and said I am glad they did it, they can't take it away from you now." The deed was prepared by a lawyer, of the grantor's own selection, at his own direction, after he had been fully advised as to its purpose and effect, and executed in the presence of his lawyer, a notary public, his son James B. Colburn, his two daughters, Margaret and Della, William Ellers, the husband of Margaret, Walter H. Myers, a friend who had no possible interest in the controversy, and Dr. James J. Murphy, his attending physician. It was also proved without contradiction that, after the deed was executed, James requested Mrs. Ellers to "put Della's name on that deed," and both Mrs. Ellers and Mrs. Staff testified that Mrs. Ellers informed her father of that request, and said " 'Pop, Jim is raising the devil with me now, and I can't stand this, he wants me to put Della's name on the deed without her consent,' and I said, 'Now what shall I do, do you want me to send for Mr. Green?' and he replied, 'Oh, no, * * * I fixed that deed for you and I want that deed to stay as I fixed it, what will that man think I am, a damn fool.'"

It was also sufficiently shown that, at the time the deed was executed, the grantor was able to dress and undress, to attend to his immediate personal needs, to go about the house and yard and at times on the street, and that, while his speech was impaired, he could be understood at times by the members of his household and others who came often in contact with him, that he was devotedly attached to his two daughters, Margaret or "Maggie" and Della, that he spoke of them as "his babies, Mrs. Ellers his real baby and Della the other one," that he was positive and. determined in his character and difficult to influence, that he lived for more than a year after the deed was executed and recorded among the Land Records of Anne Arundel County, and that during that period he made no effort of any kind to annul the transaction, although he was fully aware of what he had done.

These facts are sufficient in our opinion to compel the conclusion that the deed from Milton F. Colburn to Mrs. Ellers was the free, voluntary, and unbiased act of the grantor, and free from any taint of fraud, coercion, or undue influence, and since it was executed at a time when he was mentally competent to execute a valid deed or contract, it follows that the decree appealed from must be affirmed. In view of that conclusion it becomes unnecessary to consider the defendants' exception to testimony given by James B., Gilbert J., and Harry V. Colburn.

*Decree affirmed, with costs.*