MARMADUKE ET AL. *v.* DYER, NON COMPOS MENTIS

[No. 23, October Term, 1955.]

526

*Decided January 9, 1956.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON, and HAMMOND, JJ.

*Joseph D. Buscher,* with whom was *Donald S. Caruthers* on the brief, for the appellants.

*William L. Kahler* for the appellee.

COLLINS, J., delivered the opinion of the Court.

This is an appeal by Hazel D. Marmaduke, Temple B. Marmaduke, her husband, and William W. Dyer, appellants, from a decree setting aside a deed executed by Frieda Dyer, appellee.

William W. Dyer had been married to Frieda Dyer for nineteen or twenty years. Both had been married before. On November 2, 1939, he purchased a house and lot in Prince George's County, he says, with his own money. He placed the title in the name of his wife, Frieda Dyer, alone. The property was used as a home by Frieda and William until shortly before the filing of this suit. Frieda Dyer had a daughter, Elsa Louise Boyce, by a former marriage and William Dyer had a daughter, Hazel D. Marmaduke, also by a previous mar-

riage. On April 7, 1942, Frieda executed a will in which she left all her property to her daughter, Elsa Louise Boyce. In this will she made the following statement: "I am doing this at the request of my beloved husband, William W. Dyer, who says that he will be happy to see my daughter, Elsa Louise Boyce, receive all my real, personal and mixed property; as my husband and I have lived very happily together." At the bottom of the will the following appeared: "The undersigned, William W. Dyer, husband of Frieda Dyer, the above named testatrix, having read the foregoing will of the said Frieda Dyer and being well informed of the contents thereof and being well satisfied, does expressly consent that the said Frieda Dyer may give, devise and bequeath by said will more than one-third of her real, personal and mixed estate to others, and does hereby consent to all the terms and conditions of the said will. Dated this 7th day of April, 1942. William W. Dyer (SEAL)."

On February 18, 1953, Mr. Dyer called his daughter, Mrs. Hazel Marmaduke, on the telephone and asked her to come to his home. She drove the Dyers to Hyattsville where they went to an attorney's office. The attorney was out and it was suggested that they go to a real estate office to see a Mr. Charles L. Ervin. Mr. Ervin was asked to draw a deed conveying the house and lot to Frieda Dyer and William W. Dyer, her husband, as tenants by the entireties. He suggested that they transfer it to a straw party and have the straw party transfer it back to the Dyers as tenants by the entireties. Mr. Dyer suggested they use Mrs. Marmaduke as the straw party. The deed was prepared. When Mr. Ervin learned that Mrs. Marmaduke was a married woman he stated that it would be necessary for her husband to join in the deed. As Mr. Marmaduke was not present they decided to return with him the following day to complete the transfer of the property. On February 19, 1953, the Dyers and the Marmadukes returned to Mr. Ervin's office where the deeds were executed and acknowledgments taken before a notary, Mr. John P. Ritchie. Mrs. Dyer

could not sign her name and could only make her mark when her hand was guided. The next day, February 20th, Mr. Dyer took his wife to see Dr. Andren, a psychiatrist, and told him how his wife was acting. Dr. Andren, together with his associate, Dr. Starr, after examining her made out commitment papers for Mrs. Dyer. This commitment was not used. She was taken about March 1, 1953, to Kings County Hospital in New York for examination. There, a Dr. Springer, after ten days or about March 10, 1953, committed her to Creedmoor State Hospital on Long Island. She was still there at the time of the trial in this case.

On October 29, 1953, Frieda Dyer, *non compos mentis,* by Elsa Louise Boyce, her daughter and next friend, appellee here, filed a bill of complaint against William W. Dyer and the Marmadukes, appellants here, asking that the deed from Frieda Dyer and William W. Dyer to Hazel D. Marmaduke and the deed from Temple B. Marmaduke and Hazel D. Marmaduke to Frieda Dyer and William W. Dyer, as tenants by the entireties, be declared void. After a hearing in open court, the chancellor signed a decree granting the relief prayed and vesting the property in Frieda Dyer. From that decree the appellants appeal.

This is an equity case in which the chancellor had the atmosphere of the hearing, the appearance and demeanor of the witnesses before him, their manner of testifying which, of course, is denied to this Court on appeal. It has been stated many times here that the findings of facts so made by the chancellor should not be reversed unless we are convinced that such findings are clearly wrong.

Mr. William W. Dyer testified that in January and February, 1953, his wife was "not so good" mentally. She was forgetful, and at one time when she went to a building association to withdraw money, she withdrew more than was necessary to pay the electric bill, which was the purpose of her trip to the building association. One day she went to a store to make some purchases, taking money with her. After she returned home she

could not find the money and did not know what she had done with it. Mr. Dyer later found it under the bed-clothes. On February 5, 1953, fourteen days before the deeds were executed, Mr. Dyer took his wife to see Dr. Watts in Washington. He told Dr. Watts that his wife was rather confused, had difficulty with her memory, had crying spells, became somewhat childish and that, whereas she had formerly been rather meticulous in her housekeeping, she was then very careless. She could not cook and he had difficulty in getting her undressed for bed. Dr. Watts, after examining Mrs. Dyer, referred her to Dr. Henry E. Andren, a specialist in the field of psychiatry. About 1951 Elsa Boyce wanted the Dyers to sell their home and buy a house in New York and live near the Boyces. The Dyers visited the Boyces in New York in January, 1953, at which time Elsa asked them to dispose of the property in Maryland. Frieda did not want to do this. When they returned home Frieda said that Mr. Carr, who had drawn her will, had told her that she could change the will at any time. She wanted to change the deed. Mr. Dyer then called his daughter, Mrs. Marmaduke, who took them to Mr. Ervin and Mr. Ritchie, as aforesaid. Mrs. Dyer told Mr. Ervin what she wanted done and he then suggested the straw party. Frieda asked Mr. Dyer's daughter, Hazel Marmaduke, to be the straw party. At the time of the hearing Mr. Dyer was in the Soldier's Home and receiving rent from the property in dispute.

Mrs. Hazel Marmaduke testified that both her father and step-mother spoke to Mr. Ervin and Mr. Ritchie, the notary, about what they wanted done about the deed. She saw nothing unusual about Frieda's actions in Mr. Ervin's office. After the deeds were signed, she and her father and step-mother went to lunch and then to a department store where Mrs. Dyer bought a hat and two dresses. At that time she said Mrs. Dyer made a comment that "Elsa would not like what she had done" about the deeds. She further said that after Mrs. Dyer came back from visiting the Boyces in New York in January

she was very upset because Elsa wanted her to sell the house. Mr. Marmaduke testified that at the Ervin office Mrs. Dyer was nervous but did not do or say anything that led him to believe she did not know what she was doing.

Mrs. Evelyn Dyer, called as a witness by the appellants, testified that she was a half sister of Mrs. Marmaduke. Before Mrs. Dyer went to New York in January, 1953, she was cheerful and happy. She saw Mrs. Dyer shortly after she returned home. She was nervous and upset because Mrs. Boyce had urged her to sell the house.

Mr. Charles L. Ervin, who drew the deeds, testified that Mrs. Dyer told him she would like to transfer the title of the property. He noticed nothing unusual or peculiar about her actions or her conversation that led him to believe that at the time she signed the deeds she was not mentally capable of transferring property. He admitted that he thought it unusual that she could not write her name and that Mr. Dyer had to guide her hand when she made her mark. During the time they were in his office "they sat off to the side."

Mr. John P. Ritchie, the notary, testified that he took the affidavits on the deeds. At that time he had no conversation with Mrs. Dyer but did not notice anything unusual about her actions or demeanor. He claimed he was the one who guided Mrs. Dyer's hand when she made her mark and not Mr. Dyer.

Mrs. Lily McKay, called by the appellee, testified that she had known the Dyers since December, 1943, and that she lived next door to them. In 1952 she noticed a change in Mrs. Dyer's condition. She would start to talk and then state "I don't know what I am going to say." In the summer of 1952 Mrs. Dyer came to her house and told her she could not remember, that her head was not "working all right." Before 1952 she would wear clean clothes. Afterwards she very seldom saw her when her clothes were clean. They were "really dirty." She could not carry on an intelligent conversa-

tion. In February, 1953, she saw Mrs. Dyer in the yard in her "nighties" using the yard instead of the bathroom. She saw her do this another time. She would hang her "washing" on the line and it did not look like it had been washed. Prior to 1952 the Dyer home was always neat and clean. At one time when Mrs. Boyce was at the Dyer home she hung some blankets on the line. Mrs. Dyer took one of them down and walked around the yard dragging it back of her. Mr. McKay corroborated his wife's testimony.

Mrs. Anna Forney, sister of Mrs. Dyer called by the appellee, testified that she lived across the road from the Dyers. A year before February, 1953, Mrs. Dyer would come over to her house in the wintertime with very little clothing on. At that time Mrs. Dyer wrote a letter to one of her other sisters in Arizona and it could not be deciphered. In July, 1952, she was very mortified about Mrs. Dyer's personal appearance. She would have on stockings which did not match and shoes which also did not match. She was never clean, she did not cook anything and her home was indescribably dirty. She could not carry on an intelligent conversation. At that time Mr. Dyer told her that he did not know what he was going to do with her. Mrs. Dyer's condition became progressively worse.

Mrs. Elsa Boyce testified that she noticed a change in her mother's condition in 1952. She came down from Long Island to see her whenever she could. About Easter, 1952, Mrs. Dyer would go to the store and forget why she went there. She did not keep herself neat and clean. In July, 1952, there were no sheets on the bed, the room was untidy and there were no blinds or curtains at the windows. The house was not clean. Mrs. Dyer's clothing was dirty and she would not talk to her when anyone else was present. Formerly Mrs. Dyer had been able to take care of things about the house. In January, 1953, Mrs. Dyer visited her in New York with Mr. Dyer and they spent about a month with the Boyces. During that time she could not remove her clothing without be-

coming hysterical. She cried a great deal, could not cut her food, her clothing was soiled, and she had not had a bath for a long period of time. She had to be told when to go to the bathroom. She could not conduct a conversation. It took three of them to get her to bed at night. During that visit she took her mother to see a Dr. Springer and he gave her some nerve medicine. She would not undress or dress herself, wanted to eat with her fingers, instead of with utensils. Mr. Dyer told her at that time that he did not know what he was going to do about it. After the Dyers returned to Maryland she received a letter from her cousin telling her that her mother was not well and she should come to Maryland. When she arrived the house was worse than before. The bed was very dirty from her mother's failure to use the bathroom. She was filthy. There was no food in the house. She then took her to the Kings County Hospital in New York about February 23, 1953. Mr. Dyer, being ill with cold and fever, then entered the Soldier's Home in Washington on February 23, 1953. That same day Mrs. Boyce took him to a bank in Washington where he had a joint account with Mrs. Dyer in the amount of five hundred dollars. He signed that account over to Mrs. Boyce. She said that Mr. Dyer told her to keep the money to take care of her mother. She admitted that she had used about two hundred and seventy-five dollars of this money for an operation on herself and for dental work. She also had a joint account with her mother in a Washington bank. It was her mother's money. She drew this out of the bank and placed it in her husband's name in a New York bank. She said that Mr. Dyer told her to use it for her mother. She also said that Mr. Dyer gave her one hundred and eighty dollars to keep for him until he got well and came to stay with her.

Dr. Henry E. Andren, a psychiatrist, testified that Dr. Watts referred Mrs. Dyer to him. On February 20, 1953, Mr. Dyer brought his wife to his office. She thought the year was 1896, was unable to give her address, was

bewildered and confused, and disorganized in her behavior. Her husband told him of her behavior, for instance that she would put dishes on the table but prepared no food. He had to do all the cooking. She had become more disorganized during the prior four months. Dr. Andren's diagnosis was dementia with depression features which came on gradually. She was morose, untidy in her dress and clothing, unable to answer questions and there was very poor chance of future recovery. He advised that she be committed to a State Hospital. In his opinion she did not have sufficient mental capacity to properly care for herself or transact any business affairs. He would say that she was mentally incompetent at the time he examined her on February 20th and in his opinion had been mentally incompetent to the same degree for two or three weeks prior to his examination. He further said that Dr. Starr, who saw her the same day, concurred in his diagnosis.

Appellants rely strongly on the case of *Callis v. Thomas,* 154 Md. 229, 140 A. 59. In that case a deed was set aside on the ground that the grantor was mentally incapable of making it at the time. On appeal this Court was of the opinion that the incompetency had not been proved. However, in that case the deed was executed on January 23, 1923. There was testimony of unusual conduct on the grantor's part in 1920, shortly before confinement in a hospital for the insane for the first six months of 1920, and some unusual conduct after 1920. On the other hand, there was testimony of actual management of business transactions in a capable manner in 1921 and 1922, and sales of property in conjunction with his wife and a division of property and separation agreement made with his wife in 1922. The facts in that case are hardly comparable to those before us here. It was said in that case: "Common experience teaches us that a considerable degree of peculiarity, eccentricity, unreasonableness, pettiness, or deviation from ordinary, normal conduct, may be associated with sufficient ability to make an ordinary deed, contract or gift,

and sometimes with extraordinary ability. And this fact the law recognizes fully, although there is often a tendency to lose sight of it in court." The test is whether the grantor is of sound and disposing mind and capable of executing a valid deed or contract. It is not required that he possess the qualities of sound and disposing mind in the highest degree. *Jones v. Collins,* 94 Md. 403, 51 A. 398. Although the body is aged and stricken by disease and suffering, the mind may be competent. The fact that a person sometimes saw visions and at times failed to recognize persons whom she knew does not necessarily mean that she had not sufficient mental capacity to execute a deed. These eccentricities might be temporary. *Wise v. Swartzwelder,* 54 Md. 292. Occasional incidents of unusual conduct are not enough to prove mental incapacity at the time the paper is signed. *Mecutchen v. Gigous,* 150 Md. 79, 132 A. 425.

In *Corbin v. Powell,* 176 Md. 693, 4 A. 2d 459, as here, Corbin, through a straw man, had property formerly in his name conveyed to himself and his wife as tenants by the entireties. The deeds were set aside and an appeal taken to this Court. The deeds were executed on February 15, 1936, while he was in the hospital where he had been taken at the instance of his young wife. He remained there as a patient until May 22, 1936, having been adjudicated a lunatic on May 18, 1936. The attorney, who drew the deeds representing the wife, and the attorney, who drew a will executed within a few days of the signing of the deeds and who had been the husband's attorney for some years, both testified that he was competent to make a valid deed or contract. Judge Parke in that case said that the professional connection of these attorneys with these transactions did not admit of their being wholly disinterested in their opinion of the mental competency of the person who executed the papers. It was there said: "So, when this opinion is categorically denied by two wholly disinterested expert witnesses, who attended the man professionally while he was in the Hospital, and observed and examined him as a patient on

the day the two deeds were executed, the weight of the evidence is that the man was not competent to execute a valid deed or contract." The grantor was a mental case at the time he was received at the hospital and throughout the rest of his life. This Court concluded that the testimony of the attorneys did not prevail over the clear, definite and convincing testimony of an eminent physician and a distinguished alienist, who both examined and attended the man as a patient in the hospital. This Court concurred with the chancellor in setting aside the deeds.

The case of *Doyle v. Rody,* 180 Md. 471, 25 A. 2d 457, involved the mental capacity of Doyle, deceased at the time of the trial, to open two bank accounts in trust for himself and his brother in December, 1939. On December 1, 1939, he was examined by a specialist in neurology who found that he had cerebral arteriosclerosis, which caused him to be mentally abnormal and confused. On December 6, 1939, he wandered into a police station, was unable to tell his name, but mumbled that he had been robbed. The next day he darted out of the back door of his niece's home to avoid a medical examination. On December 12th he was taken to a bank for the purpose of signing a draft. The bank asked for a doctor's certificate showing there was no mental disability of the depositor. He was examined by Dr. Speicher of Westminster in the presence of another doctor, who was president of the bank. Dr. Speicher concluded that Doyle had suffered a slight stroke indicating a hemorrhage of the brain and that he had some cerebral pressure which to some extent affected his mental faculties. However, he certified that Doyle was of sound and disposing mind. On December 22nd Doyle opened the joint accounts in question. It was stated in that case that a person to be of sound and disposing mind must understand the nature of his act, and its effect, the person to whom he means to give it, the manner in which he disposes of it, and the relative claims of the different persons who are or should be the objects of his bounty. The validity of a convey-

ance will not be destroyed where the person retains a full comprehension of the effects of his act at the time of the execution. It was said in that case: "While the law presumes sanity and testamentary capacity, yet when it appears that a person was in such an enfeebled condition of mind and body immediately before and immediately after the date of a transaction as to render him incompetent to transact business, the presumption arises that he was unable to understand what he was doing at the time of the transaction, and the burden of proof as to his capacity to dispose of his property at that particular time is imposed upon the grantee. *Brown v. Ward,* 53 Md. 376, 387, 396, 36 Am. Rep. 422; *Davis v. Denny,* 94 Md. 390, 50 A. 1037; *Ralston v. Turpin,* 129 U. S. 663, 9 S. Ct. 420, 32 L. Ed. 747." Two doctors expressed the opinion that Doyle could not possibly have had any lucid intervals in the month of December, 1939. Their opinion was substantiated by two psychiatrists. This Court affirmed the chancellor in decreeing that the funds in question belonged to Doyle's administrators, irrespective of the opinion of Dr. Speicher.

The chancellor, who saw and heard the witnesses, in his opinion in the instant case, reviewed the evidence and was impressed by the fact that Mrs. Boyce's testimony as to her mother's condition was to a large extent corroborated by that of Mr. Dyer, and also by the fact that within a short time after the deeds were executed Mrs. Dyer was admitted to Creedmoor Mental Hospital as a permanent patient. He found from the testimony "that Mrs. Dyer was a mentally ill person who did not and does not understand just what was accomplished at the time of the signing of the Deeds." He also was not unmindful of the fact that Mrs. Boyce obtained possession and used a portion of her mother's funds for her own use which she had no right to do. He expressed the opinion that, if a proper proceeding was brought, Mrs. Boyce might be required to fully reimburse Mrs. Dyer, but that that matter was not before him at that time.

There is no doubt in this case that Mrs. Dyer was the rope in a tug of war between her daughter and her step-daughter. However, it is significant that on April 7, 1942, when Mrs. Dyer held title to the property here in dispute, by written instrument both Mr. and Mrs. Dyer agreed that Mrs. Boyce was to receive all her property at her death. The chancellor apparently was not impressed by Mrs. Marmaduke's statement that Mrs. Dyer said, after the deed was signed, "Elsa would not like what she had done." It is also significant that Mr. Dyer himself took his wife to see Dr. Watts on February 5, 1953, fourteen days before the deeds were executed, on account of her peculiar actions. The fact that Mrs. Dyer could not even make her mark on the deeds without assistance is noteworthy. It is also very convincing that the day after the entirety deed was signed Mr. Dyer took his wife to a psychiatrist of his own selection, Dr. Andren, who saw and examined her. He stated that Mrs. Dyer did not have sufficient mental capacity to care for herself or to transact any business, was mentally incompetent the day after she signed the deeds, and had been mentally incompetent for two or three weeks prior to his examination. This diagnosis was confirmed by his associate, Dr. Starr.

With this testimony we cannot say that the chancellor, who saw and heard the witnesses, and had the atmosphere of the trial, was clearly wrong in finding that Mrs. Dyer was mentally incompetent at the time the deeds were executed, and in setting those deeds aside. The decree will be affirmed.

*Decree affirmed, with costs.*